Mitchell **BLOCK**, President, Direct Cinema Ltd., Inc., et al., Appellants,

v.

Edwin **MEESE**, III, Attorney General of the United States, et al.

No. 84–5318.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1985.

Decided June 18, 1986.

As Amended June 18, 1986.

Charles S. Sims, New York City, with whom Susan W. Shaffer, Washington, D.C., and James A. Sevinsky, Albany, N.Y., were on brief, for appellants.

Harold J. Krent, Atty., U.S. Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty. and Leonard Schaitman, Atty. U.S. Dept. of Justice, Washington, D.C., were on brief, for appellees.

Before BORK and SCALIA, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This case concerns the Justice Department's classification of three films as "political propaganda" under the Foreign Agents Registration Act, and its consequent application of its regulations requiring the foreign agent distributing the films to make public disclosure of the names of certain recipients and exhibitors. The principal questions presented are, preliminarily, the standing of the present appellants to challenge these actions, and, on the merits, the lawfulness of these actions under the statute and under the first amendment.

## I

Appellant Mitchell Block is President of Direct Cinema, a company which is the sole distributor in the United States of the film *If You Love This Planet,* a documentary portraying the perils of nuclear war.

The remaining appellants—environmental groups, the State of New York, a library association, and a private theater—represent would-be exhibitors of this and two other documentary films, *Acid Rain: Requiem or Recovery* and *Acid From Heaven,* which describe the detrimental environmental effects of acid rain. All three films were produced by the National Film Board of Canada, an instrumentality of the Canadian government, and are disseminated in the United States by the New York office of that organization. (The New York office will hereinafter be referred to as "NFBC.") *If You Love This Planet* is transmitted from the NFBC to Direct Cinema, which is responsible for its further distribution; the two acid rain films are available for sale or rental directly from the NFBC.

Since 1947, the NFBC has registered with the Justice Department as an "agent of a foreign principal" under the Foreign Agents Registration Act of 1938, ch. 327, 52 Stat. 631 (codified as amended at 22 U.S.C. §§ 611–621 (1982)) ("FARA"), 22 U.S.C. § 611(c), which requires that those who serve a foreign government, political party, or corporation, 22 U.S.C. § 611(b), and "engage[ ] within the United States in political activities for or in the interests of such foreign principal," 22 U.S.C. § 611(c)(1)(i), register with the Department of Justice and periodically provide certain information as to their relation to that foreign principal, their sources of income, and the nature of their activities, 22 U.S.C. § 612. The NFBC's most recent registration statement describes its activities as "[p]romotion and distribution through commercial and non-commercial channels of Canadian Government information, documentary and cultural films, filmstrips, and other visual aid materials."

The NFBC's status as a registered agent is not contested on this appeal, nor is the constitutionality of the registration provisions just described. The dispute before us concerns a separate provision of the Act, which requires a registered foreign agent to notify the Justice Department within

forty-eight hours after it transmits or causes to be transmitted "any political propaganda for or in the interests of [its] foreign principal." 22 U.S.C. § 614(a). "Political propaganda" is defined to include any form of communication "reasonably adapted to ... prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public ... with reference to the political or public interests, policies, or relations" of a foreign government or political party or the foreign policy of the United States, 22 U.S.C. § 611(j). The statute further provides that this notification shall be accompanied by a statement "setting forth full information as to the places, times, and extent of such transmittal." 22 U.S.C. § 614(a). The Justice Department regulations implementing the latter provision require the agent to report the name of each individual or group receiving 100 copies or more of the material and in addition, in the case of a film, the name of each "station, organization, or theater using" the film, the dates the film was shown, and the estimated attendance. 28 C.F.R. § 5.401(b) (1985); Report Form CRM–159 (formerly Form OBD–69). The Act provides that these reports "shall be public records and open to public examination and inspection," 22 U.S.C. § 616(a).

Rather than automatically treating every film it disseminates as "political propaganda," the NFBC includes a list of titles of new films in the supplemental registration reports it files with the Registration Unit of the Justice Department. From the list of sixty-two titles submitted for the six-month period ending June 30, 1982, five films were selected for screening, and on January 13, 1983, the Registration Unit informed the NFBC that three of those five, the films at issue in this case, constituted "political propaganda" within the meaning of the Act. The NFBC thereupon notified Block that he would be required to assist in meeting the reporting requirements.

Appellants filed this suit in the United States District Court for the District of Columbia seeking declaratory and injunctive relief against the Attorney General and the Chief of the Registration Unit, challenging (insofar as is relevant here) the propriety of their classifying these films as "political propaganda" and the constitutionality of the classification and reporting provisions.[1] The District Court did not reach the merits of the claims. Upon the government's motion to dismiss for lack of standing and cross-motions for summary judgment, the court held that appellants had failed to allege facts sufficient to sustain standing. *Block v. Smith,* 583 F.Supp. 1288 (D.D.C.1984). Appellants appeal under 28 U.S.C. § 1291 (1982).

## II

The principal element of standing at issue here is one of constitutional dimensions: whether the allegedly illegal government actions of which these appellants complain affect them personally in a concrete way. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). If they do not, the "properly limited ... role of the courts in a democratic society," *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), requires that correction of the alleged illegality be left to the political branches. *See Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). For purposes of our decision, we must accept as true all material allegations of the complaint and of the affidavits filed in connection with the summary judgment motions; and on each issue it will suffice to maintain the suit if these facts show that any one of the appellants has standing. *See, e.g., Village of Arlington Heights v. Metropolitan Housing Develop-*

---

1. The suit also challenged the Act's requirement that a label be affixed at the beginning of each item of "political propaganda," disclosing certain information about the agent and its foreign principal. 22 U.S.C. § 614(b). This challenge was withdrawn after the government stipulated that appellants were not prohibited from removing the labels.

*ment Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977).

■ Appellant Block's company, Direct Cinema, purchased exclusive rights to distribute *If You Love This Planet*, has acquired over 150 prints of the film, and has devoted considerable resources to marketing it. Block asserts that the Justice Department's classification of the film as "political propaganda" means that "potential customers, particularly public institutions such as public schools, colleges and libraries, will never purchase or use [it]." Block Declaration at ¶ 11. This otherwise conclusory allegation is supported not only by the recitation of instances in which potential customers declined to take the film because of the classification, but by the affidavits of potential customers as well. For example, the Director of the Rhode Island Library Film Cooperative stated that "[b]ut for that designation and the controversy it engendered, the Cooperative would already have purchased and would now possess *If You Love This Planet*." Barkman Declaration at ¶ 5; *see also* Roberts Declaration at ¶ 4. These factual assertions seem to us clearly sufficient to establish concrete, particularized harm to Block's company, and hence to Block, attributable to the classification.

■ The other governmental action complained of is the requirement that the NFBC set forth in a publicly available report (1) the names of those to whom it transmits 100 or more copies of the films and (2) the names of organizations and theaters exhibiting the films. With regard to the first part of this reporting requirement, we agree with the District Court that inadequate facts were alleged. None of the appellants except Block raises the possibility of being named under this provision, since only he has acquired or expresses any intent to acquire 100 or more copies of a film directly from the NFBC. Block asserts that the "stigmatization" of his company attributable to its listing on the report is "likely to [a]ffect [its] relationship with independent producers of films and with businesses and organizations consider-

ing a relationship with [it]"; that he is "greatly concerned" that this stigmatization "will be damaging to current discussions regarding the potential acquisition of Direct Cinema by another company"; and that because of his association with Direct Cinema his own "reputation and credibility as a high quality filmmaker and distributor has also been injured." Block Declaration at ¶¶ 15–17. This mixture of speculation and conclusory assertion concerning the consequences of being publicly branded a recipient of a Canadian "propaganda" film does not satisfy the Supreme Court's requirement for "specific, concrete facts" demonstrating injury, and "particularized allegations of fact." *Warth v. Seldin*, 422 U.S. at 508, 501, 95 S.Ct. at 2210, 2206. Thus, we must conclude that this element of the reporting requirement is not properly before us.

■ The facts alleged by Block and others do establish, however, that the NFBC's setting forth in a publicly available report the names of organizations and theaters using the films Block distributes creates a disincentive to acquire those films and thus reduces Block's company's profits. That was the clear import of Block's assertion that "[a]t least a dozen customers have specifically asked us not to reveal their names ... and many of them asked whether they had to use their correct names," Block Declaration at ¶ 13, and of the New York Library Association's assertion that "public maintenance of [libraries'] names on a government list as purveyors of foreign 'political propaganda' ... could cause problems for NYLA and its members," Shields Declaration at ¶ 4. The principal "problem," obviously, is the political aversion of these public instrumentalities to being identified as distributors of a "propaganda" film, supported by the allegations discussed earlier in connection with standing to challenge the classification provision. Whether that aversion is justified or not, facts have been alleged showing that it exists and that it affects Block's sales; and it is obviously brought into play by this part of the reporting requirement

as well as by the classification provision. We conclude, therefore, that injury to Block resulting from this element of the reporting provision has been adequately alleged. Since, moreover, that injury consists of the disruption of a vendor-vendee relationship, it gives Block standing to raise alleged violations of his vendees' first amendment rights related to their dealings with him, *see FAIC Securities, Inc. v. United States*, 768 F.2d 352, 358–61 (D.C. Cir.1985).

■ The government argues, and was successful in persuading the District Court, that even if concrete, particularized harm was adequately alleged, it was not harm fairly traceable to the government's conduct. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976). It is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons. If that principle were true, it is difficult to see how libel actions or suits for inducing breach of contract could be brought in federal court; or, to use a more proximate analogy, how state threats and intimidation directed at the distributors of certain books could confer standing upon the publisher whose sales are affected, *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 636 n. 6, 9 L.Ed.2d 584 (1963). The government's point, however, is that the public reaction which underlies all the alleged harm in the present case is an irrational one, based upon a "false impression" of the meaning of the "political propaganda" classification—so that the harm cannot properly be said to have been *caused* by the government. *See Block v. Smith*, 583 F.Supp. at 1295 & n. 9. That argument could be relevant to the merits of a tort action seeking to hold the government liable for damages as the *legal cause* of Block's injury; but it is irrelevant to the question of core, constitutional injury-in-fact, which requires no more than *de facto* causality. Whether the public has been irrational in interpreting the "political prop-

aganda" classification as a judgment that these films are biased or unAmerican seems to us no more relevant to the issue of standing in the present case than it was relevant to the issue of standing in *NAACP v. Alabama*, 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958), whether the citizens of Alabama were irrational in their reaction to membership in the NAACP.

### III

■ We have concluded that the District Court's dismissal for lack of standing was in error as to the classification challenge and that portion of the reporting challenge relating to organizations and theaters using the films. Were we to stop there and remand, we would be likely to find the case back before us on appeal from the District Court's disposition on the merits. Since this appeal arose on cross-motions for summary judgment, presenting only issues of law, efficiency suggests that we address the substantive claims at this time.

■ We turn first to the appellants' statutory arguments, since invalidation of the Justice Department's action on those grounds would spare us the necessity of addressing constitutional issues. Appellants have not challenged the Department's authority under the statute to classify films, nor have they urged that the reporting requirement imposed by the Department goes beyond the rulemaking authority for implementation of the Act conferred by 22 U.S.C. § 620. Their sole statutory claim is that a film cannot be classified as "political propaganda" under the Act unless it is (1) "subversive," and (2) disseminated in the *political* interests" of a foreign principal.

Appellants set forth extensive portions of the FARA's legislative history to establish that the particular object of Congress's concern was subversive propaganda activities. As a purely analytical matter, such a showing does not lead to the conclusion that the statute was meant to cover only such activities. To legislate is to general-

ize, and a law motivated by a desire to eliminate a particular abuse often sweeps within its reach activities that do not themselves display that abuse. That is particularly true of statutory provisions such as those at issue here, which impose no more onerous an obligation than disclosure. Even if Congress was exclusively concerned with "subversive" propaganda, it might reasonably have thought it better to cast a wider disclosure net—not only to be certain that everything it was concerned about would be covered, but also to spare the Executive and the courts the necessity of making the sensitive and condemnatory judgment of what is "subversive." There is some reason to believe that this abstract speculation fits the reality of the present enactment. While the investigations which led to the FARA's enactment were undoubtedly aimed at "subversive propaganda," *see* H.R. Res. 424, 73d Cong., 2d Sess., 78 CONG.REC. 11,069 (1934), the statute as drawn was not so narrow, but covered all communications issued by foreign agents, "whether friendly or unfriendly, whether violent or mild," *United States v. Kelly*, 51 F.Supp. 362, 363 (D.D.C.1943). It was precisely the fact that the Act would cover our allies as well as our enemies which induced President Roosevelt to veto the original legislation, *see* 88 CONG.REC. 1139 (1942), thereby causing Congress to add a special exception from registration when necessary to protect United States defense interests, *see* 22 U.S.C. § 613(f).

More fundamentally, however, both the abstract speculation and the reality of the legislative history are beside the point. We do not sit to rewrite laws so that they may address more precisely the particular problems Congress had in mind. There is simply no language within the text of the present enactment that would enable importation of the limitation appellants suggest. Unlike, for example, the statute involved in *Stromberg v. California*, 283 U.S. 359, 361, 369, 51 S.Ct. 532, 533, 535, 75 L.Ed. 1117 (1931), which covered only "propaganda that is of a seditious character," the present statute covers any form of communication which is "reasonably

adapted to ... in any ... way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party or with reference to the foreign policies of the United States." 22 U.S.C. § 611(j). We are not at liberty to eliminate what appellants consider a legislative overbreadth.

Appellants' second point, that the propaganda must be disseminated in the "*political* interests" of the foreign principal, encounters similar difficulties—not to mention the inherent unattractiveness of adopting a limitation that requires the Executive and the courts to intuit, case by case, when the agent of a foreign political entity is acting in its political interest and when he is acting in its nonpolitical interest (whatever that might mean). This limitation also is not to be found in the text of the statute, which imposes the reporting requirements whenever a foreign agent transmits "any political propaganda for or in the interests of [the] foreign principal." 22 U.S.C. § 614(a). Essentially, appellant is asking us to revise the last phrase to read "for or in the *political* interests of [the] foreign principal." We decline to do so—particularly since the phrase performs a perfectly comprehensible function without the added limitation, *viz.*, distinguishing between materials that a foreign agent disseminates on behalf of his foreign principal and those that he disseminates on his own behalf. *See* H.R. REP. No. 1470, 89th Cong., 2d Sess. 13 (1966), U.S.Code Cong. & Admin. News 1966, p. 2397; S.REP. No. 875, 88th Cong., 2d Sess. 12 (1964).

### IV

Having found no substance to appellants' statutory objections, we must confront their constitutional claims. These consist principally of first amendment claims that are relatively narrow. There is no contention, nor could there be, that the government has sought to prohibit the obtaining or exhibiting of the films, *cf. Young v. American Mini Theatres, Inc.*, 427 U.S.

50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976); to limit the times or places of exhibition, *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975); to condition exhibition upon registration or permit approval, *see Thomas v. Collins*, 323 U.S. 516, 540, 65 S.Ct. 315, 327, 89 L.Ed. 430 (1945); to condition receipt of the films upon any type of "official act," *see Lamont v. Postmaster General*, 381 U.S. 301, 305, 85 S.Ct. 1493, 1495, 14 L.Ed.2d 398 (1965); or "deliberately ... to achieve the suppression" of the films by "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," *Bantam Books, Inc. v. Sullivan*, 372 U.S. at 67, 83 S.Ct. at 637. Rather, the infringements on free speech are asserted to arise from the indirect deterrent effect upon exhibitors and viewers of two governmental acts: official classification of the material as "political propaganda" and public disclosure of exhibitors' names. We address each of these in turn.

A. *Classification*

▇▇ Appellants challenge the constitutionality of classifying these films as "political propaganda" on the ground that such action "officially brand[s] the content of the films as false or misleading" and thus "negatively influence[s]" persons who might view the films and "rigs the marketplace of ideas." Brief for Appellants at 55. It is important to be clear about the nature of this constitutional attack. Appellants do not contest the constitutionality, either as a general matter or in the particular circumstances of the present case, of officially identifying films as the product of a foreign government's effort to disseminate its

political views. Their claim is that the statutory term "propaganda" goes beyond such identification, and amounts to a constitutionally prohibited governmental pronouncement that the films contain "misstatements, half-truths and attempts to mislead," *id.* at 54.

This assertion is not supported by the statute's definition of "political propaganda"—which includes communication that is simply "reasonably adapted to ... prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public ... with reference to the political or public interests, policies, or relations" of a foreign government or political party or the foreign policy of the United States. 22 U.S.C. § 611(j).[2] This definition is in accord with dictionary definitions of the term "propaganda"—*e.g.*, "ideas, facts, or allegations spread deliberately to further one's cause or to damage an opposing cause," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 942 (1983); "information or ideas methodically spread to promote or injure a cause, group, nation, etc.," THE RANDOM HOUSE COLLEGE DICTIONARY 1060 (1982).

It seems to us not quite true that, as asserted in a district court opinion involving the same provision at issue here (with whose holding we disagree) " '[p]olitical propaganda' is ordinarily and commonly understood to mean material that contains half-truths, distortions, and omissions." *Keene v. Smith*, 569 F.Supp. 1513, 1520 (E.D. Cal.1983) (granting preliminary injunction); *see also Keene v. Meese*, 619 F.Supp. 1111 (E.D. Cal.1985) (granting plaintiffs' motion for summary judgment), *probable jurisdiction noted*, —— U.S. ——, 106 S.Ct. 1632, 90 L.Ed.2d 178 (1986). It is

---

**2.** The definition also includes communication "reasonably adapted" to the less savory end of "promot[ing] in the United States racial, religious, or social dissensions," and communication "which advocates, advises, instigates, or promotes any racial, social, political, or religious disorder, civil riot, or other conflict involving the use of force or violence in any other American republic or the overthrow of any government or political subdivision of any other American republic by any means involving the

use of force or violence." 22 U.S.C. § 611(j). These elements of the definition, to the extent they are not redundant, are of course artificial. It could hardly be contended that classification of speech as "political propaganda" raises these specific unpleasant images in the public mind; and appellants have made no such assertion here. *No* element of the definition lends any support to appellants' claim, which is that "propaganda" means untruth.

understood to *mean* precisely the type of political speech the dictionary definitions quoted above describe (and which no other English word accurately describes)—which type of speech is, in turn, generally *regarded* as more likely than other speech to contain "half-truths, distortions, and omissions."[3] The government's concededly accurate and lawful identification of an objective phenomenon that is suspect does not constitute the government's expression of its own official suspicion. The record in the present case refutes any equivalence between classification of a film as "political propaganda" under the Act and governmental disapproval, not only because the term is applied to material disseminated by our closest friends and allies (such as Canada), but also because many specific items so classified have fostered policy positions consistently supported by the United States—for example, a film distributed on behalf of the Consulate General of Israel entitled *Plight of the Soviet Jewry: Let My People Go*, a film distributed on behalf of the German Consulate General entitled *The Wall of Terror*, and a videotape distributed on behalf of the Government of Japan entitled *Trade—Who Needs It?*

The insubstantiality of appellants' essentially terminological attack upon the classification scheme is encapsulated in their assertion that the unconstitutionality would be cured if the statutory text were changed from "political propaganda" to "political advocacy." Brief for Appellants at 57. In its current usage, of course, the word "advocacy" connotes taking a position but not (as does the word "propaganda") deliber-

ately seeking to disseminate that position widely. If it were regularly applied to the latter phenomenon, however, it would soon produce in the public mind the same degree of skepticism that the word "propaganda" now evokes—presumably requiring, under appellants' view of the law, that the government retreat to yet another term that is untainted only because it is not entirely accurate. In short, it seems to us that in labelling something "propaganda" the government is not expressing its own disapproval but is merely identifying an objective category of speech of which the public generally disapproves. Unless the identification itself is inaccurate or unconstitutional (which appellants do not contend) there is no conceivable basis for a first amendment objection.

 Moreover, even if classification as "propaganda" constituted an expression of official government disapproval of the ideas in question, neither precedent nor reason would justify us in finding such an expression *in itself* unlawful. Not every governmental action which affects speech implicates the first amendment. *See, e.g., Regan v. Taxation With Representation,* 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983). Appellants invoke Justice Jackson's famous pronouncements that the first amendment was meant to "foreclose public authority from assuming a guardianship of the public mind," and from "protect[ing] the public against false doctrine," *Thomas v. Collins,* 323 U.S. at 545, 65 S.Ct. at 329 (Jackson, J., concurring). The government's criticism of ideas, they suggest, prevents the "'uninhibited, robust, and wide-open' debate," *Lamont v.*

---

**3.** This same sequence—from accurate meaning to general distrust of the phenomenon accurately described—explains the fact, emphasized by appellants, that some dictionaries, after defining "propaganda" substantially as we have set forth earlier, describe it as having a "pejorative" connotation, Harper Dictionary of Contemporary Usage 501 (1975), or as "now often used in a disparaging sense, as of a body of distortions and half-truths," Funk & Wagnalls Standard College Dictionary 1080 (1973). Undoubtedly, one would not describe the ideological efforts of one's own church or nation as "propagandizing," though they are such—just as one would

prefer to describe one's brother-in-law as a merchant rather than a used-car-salesman. Though dictionaries (which are mercifully not compiled by lawyers) do not draw such refined distinctions, it seems to us less accurate to say that the *use* of the precise word "propaganda" is pejoration, than that the social convention of *not* using it to refer to ideological efforts that one favors constitutes euphemism. In any case, we do not think the Constitution requires the United States Code to be semantically updated periodically so that its words not only say what they mean but also have no current pejorative coloration.

*Postmaster General,* 381 U.S. at 307, 85 S.Ct. at 1496 (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)), the "free political discussion," *Stromberg v. California,* 283 U.S. at 369, 51 S.Ct. at 536, and the "uninhibited marketplace of ideas," *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969), contemplated by the first amendment.

But the "guardianship of the public mind" that Justice Jackson castigated in *Thomas v. Collins* was the situation that would arise from the government's *"regulating the press, speech, and religion,"* 323 U.S. at 545, 65 S.Ct. at 329 (emphasis added). And the attempt "to protect the public against false doctrine" that he criticized was a state-imposed requirement that labor organizers register before making any public speech. We know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content. Nor does any case suggest that "uninhibited, robust, and wide-open debate" consists of debate from which the government is excluded, or an "uninhibited marketplace of ideas" one in which the government's wares cannot be advertised.

If the first amendment considers speakers to be so timid, or important ideas to be so fragile, that they are overwhelmed by knowledge of governmental disagreement, then it is hard to understand why official governmental *action,* which speaks infinitely louder than words, does not constantly disrupt the first amendment "marketplace." A rule excluding official praise or criticism of ideas would lead to the strange conclusion that it is permissible for the government to prohibit racial discrimination, but not to criticize racial bias; to criminalize polygamy, but not to praise the monogamous family; to make war on Hitler's Germany, but not to denounce Nazism. It is difficult to imagine how many governmental pronouncements, dating from the beginning of the Republic, would have been unconstitutional on that view of

things. Consider, for example, the disparagement of pacificism contained in the Joint Resolution of March 29, 1800, commending the action of Captain Thomas Truxton and the crew of the United States frigate *Constellation* in their engagement with the French ship of war *La Vengeance,* and specifically praising the conduct of midshipman James Jarvis, "who gloriously preferred certain death to an abandonment of his post." 2 Stat. 87 (1800). A state's selection of history and government textbooks for use in its public schools represents a most forceful and influential expression of official approval and disapproval of ideas. It cannot be a response to these points that the only subjects off-limits to the government are those as to which there is less than substantial unanimity among the people—thus permitting official positions on war heroism and motherhood, but excluding nuclear disarmament and acid rain. That distinction would raise the intolerable prospect of the courts' deciding what ideas are sufficiently popular to be granted government support—the object being, presumably, to assure that only the ideas of insular minorities will suffer official disparagement.

The practical problems of excluding the government from ideological debate are alone enough to suggest that, even if it were a socially desirable objective, it is not an objective to be pursued by the courts. It would constantly be necessary to decide when the government has crossed the line between mere fact-finding (which presumably remains constitutional) and ideological advocacy—a problem exemplified by use of the word "propaganda" in the present case, but much more acute in other contexts, where the difference between factual statement and advocacy may turn upon the debatability of the facts described as true, or the pertinency of facts omitted. It would also be necessary to determine precisely what constitutes official governmental action for the purpose of expressing ideas—a much more difficult task than determining what constitutes governmental action for the purpose of regulating or affecting pri-

vate conduct. Presumably a joint resolution of Congress (*i.e.*, a bill signed by the President) would suffice. What of a concurrent resolution? A presidential address? An address by a Cabinet Secretary or a Bureau chief?

The short of the matter is that control of government expression (which would *always* seem to fall in the category of political expression, the most protected form of speech) is no more practicable, and no more appealing, than control of political expression by anyone else. In the words of an eminent constitutional scholar not noted for a crabbed view of the first amendment, the guarantee of freedom of speech "does not mean that government must be ideologically 'neutral,'" or "silence government's affirmation of national values," or prevent government from "add[ing] its own voice to the many that it must tolerate." L. TRIBE, AMERICAN CONSTITUTIONAL LAW 588, 590 (1978); *see also* T. EMERSON, THE SYSTEM OF FREEDOM OF EXPRESSION 697–716 (1970).

Appellants seek to retreat to higher ground by arguing that what the first amendment proscribes is not the government's espousal of particular views, nor even its criticism of opposing views, but only its disapprobation of "certain books and films." Brief for Appellants at 56. On this view, presumably, formal denunciation of Nazism and Communism would be constitutional, but not criticism of MEIN KAMPF and the COMMUNIST MANIFESTO. We find this distinction too precious to be of constitutional dimensions. The line of permissibility, we think, falls not between criticism of ideas in general and criticism of the ideas contained in specific books or expressed by specific persons; but rather between the disparagement of ideas (general or specific) and the suppression of ideas through the exercise or threat of state power. If the latter is rigorously proscribed, *see Bantam Books, Inc. v. Sullivan,* 372 U.S. at 72, 83 S.Ct. at 640, the former can hold no terror.

It may well be that threat and thus suppression would be the consequence of a scheme for systematic review of books and films by an official evaluator, in order that the government may label their content approved or condemned. But that is not the case before us here. The independent validating purpose of the registration and classification scheme of the FARA—separate and apart from any purpose of enabling expression of governmental disapproval of content—is unquestioned. As noted earlier, appellants would have no objection to the scheme if only the government used what they consider more appropriate terminology. Moreover, the scheme relates only, and indiscriminately, to material disseminated by a particular category of source, a category appropriate to the independent validating purpose and quite unsuited to the purpose of content control (since the label "propaganda" will often be attached to positions that the government favors). In these circumstances, appellants' contentions amount to no more than objection to governmental criticism *in principle*—which, for the reasons discussed, we must reject.

 Appellants devote approximately one page of their brief to the argument that the classification provision, which contains no statutory requirement for notice and hearing, deprives them of liberty without due process of law; and approximately three pages to the argument that it is unconstitutionally vague. These points can be rejected even more succinctly than they were raised. As to due process: As we have discussed above, the classification does not constitute a "stigmatization," even of the films, much less of appellants themselves. And even if it did, "stigmatization" alone, "divorced from ... effect on the legal status of an organization or a person, such as loss of tax exemption or loss of government employment," does not constitute a deprivation of liberty for due process purposes. *Paul v. Davis,* 424 U.S. 693, 705, 96 S.Ct. 1155, 1162, 47 L.Ed.2d 405 (1976). The only effect on legal status accompanying the classification here, if any, pertained to the registering foreign agent and not to any of these appellants.

As to unconstitutional vagueness: Since the legal duties that turn upon whether or not this material is in fact "political propaganda" fall upon the foreign agent alone, and are not asserted to affect the foreign agent's willingness or ability to enter into contractual relations with these appellants, it is beyond imagination how anyone except the foreign agent would have standing to complain about the vagueness of the statutory command. Nor does this fall into the small category of cases in which a direct statutory prohibition of speech will allow one person, as to whom the prohibition is valid, to complain of restrictions upon the rights of others that do not affect him. *See Young v. American Mini Theatres, Inc.*, 427 U.S. at 58–61, 96 S.Ct. at 2446–48.

## B. *Dissemination Reports*

■ We turn, finally, to the provision of the regulations requiring a foreign agent to report the name of each "station, organization, or theater using" a "political propaganda" film that it transmits, together with the dates the film was shown and the estimated attendance. 28 C.F.R. § 5.401(b); Report Form CRM–159 (formerly Form OBD–69). It is clear that the challenge to this provision, unlike the challenge to alleged official criticism, is directed to governmental action that implicates the first amendment. The Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment," *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976), and has consistently required the application of a balancing test, *id.; see also Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *Bates v. City of Little Rock*, 361 U.S. 516, 524–27, 80 S.Ct. 412, 417–18, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. at 461–63, 78 S.Ct. at 1171–72. We must examine, therefore, the governmental justification for the imposition in this case, and the "extent of the burden that [it] place[s] on individual rights." *Buckley v. Valeo*, 424 U.S. at 68, 96 S.Ct. at 658.

The government has advanced essentially two interests to support the provision. First, it argues that the provision "increases the Department's ability to ensure that registered agents comply with the Act's requirements," and "allow[s] the government to monitor the agents' activities more easily," Brief for Appellees at 61, 54 n. 22. The government points out that in *Buckley v. Valeo*, 424 U.S. at 66–67, 96 S.Ct. at 657, the required disclosure of the names of contributors and recipients of campaign funds was upheld on the ground, *inter alia*, that disclosure made it easier to detect violations of the Federal Election Campaign Act.

This argument has greater force with respect to the reporting requirement that we have eliminated from consideration on standing grounds than to the one that remains before us. Persons who receive 100 or more copies of a propaganda item from a foreign agent—or at least those who do so regularly—may be worth investigating as being, perhaps, themselves agents of the foreign principal. It is much less apparent how the name of each organization and theater that "uses" even a single copy of a propaganda film provides significant assistance in monitoring the foreign agent or in identifying other, non-registered foreign agents. Assuming, however, that this interest in enforcing the Act does suffice to justify the government's obtaining the information at issue here, that still does not meet appellants' objection. The gravamen of their complaint is that the Act permits this information to be made public, and indeed positively requires it to be available for public inspection, thus exposing exhibitors to public criticism and thereby discouraging them from purchasing or leasing the films. Compelled public disclosure presents a separate first amendment issue; the publication aspect, and not the information-gathering aspect alone, must be justified. *See Bates v. City of Little Rock*, 361 U.S. at 524–25, 80 S.Ct. at 417; *Shelton v. Tucker*, 364 U.S. 479, 486–87, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). The reporting provision upheld in *Buckley v. Valeo* con-

tained a publication requirement, but it was justified on grounds beyond mere enforcement necessity, *see* 424 U.S. at 66–68, 96 S.Ct. at 657–58, as it seems to us reason requires.

We turn, then, to the second state interest proffered by the government, the interest in "disclos[ing] to the public the nature and extent of agents' dissemination of foreign advocacy." Brief for Appellees at 54 n. 22. It is unquestionable that this is a general objective of the statute, and of the regulation here under challenge. And it is obvious that the objective cannot be substantially achieved if the published report fails to disclose the diverse segments of society which the foreign agent has been successful in reaching with his principal's message. In the case of films, the only sure means of achieving that goal is to name in the report not only the initial recipient of the film but also the organizations and theaters that screen it.

This interest in public awareness is not, we are inclined to think, a state interest of the highest importance. Whether it suffices for present purposes, however, depends upon the degree of impairment of first amendment values that the publication produces. Here, we can discern two such values.

First, the right to receive ideas in privacy. *See Lamont v. Postmaster General,* 381 U.S. at 307, 85 S.Ct. at 1496; *cf. Procunier v. Martinez,* 416 U.S. 396, 422–24, 94 S.Ct. 1800, 1815–16, 40 L.Ed.2d 224 (1974) (Marshall, J., concurring). The reporting provision does not impair this right on the part of *individuals,* since it does not require identification of those who view the films, and the only "users" who must be disclosed are stations, organizations and theaters. Arguably, however, the Constitution recognizes an associational interest, as well as an individual interest, in the privacy of receipt of ideas—and that would unquestionably be affected. Consider, for example, a private association (fraternity, lodge, union or discussion group) that purchases a film directly from a foreign agent, or that uses a purchased film (*e.g.,* one of

appellant Block's), in order to show it exclusively to its own members. What political information such a group chooses to consider and discuss is not public beyond its own membership, but in the case of foreign propaganda films the challenged reporting provision would require it to be disclosed.

None of the organizations who are appellants asserts that it wishes to use the films only for viewing by its own select membership—and the nature of those organizations (groups advocating environmental protection, a library association, and the State of New York) would make such an assertion implausible. To the contrary, they uniformly assert that they seek the films "to educate the community," *see* Converse Declaration at ¶ 6; Erlandson Declaration at ¶ 5; Kulick Declaration at ¶ 6; Sauer Declaration at ¶ 6, as "part of [their] education program," Brown Declaration at ¶ 5, and as "tools in ... efforts to convince policy makers and the public," *id.* at ¶ 10; *see also* Cleveland Declaration at ¶ 8. Nor has this specific first amendment interest been asserted by any of these appellants (including Block) even in the abstract, on behalf of anyone else. Even assuming that it is properly before us, however, we find its impairment outweighed by the governmental purposes pursued here.

It must be emphasized, first of all, that there is no reason to believe that the reporting requirement has as its ultimate objective public disclosure of what films private organizations are viewing. That is, rather, an unavoidable means of achieving its ultimate objective, which is to bring to public attention the scope and success of foreign agents' propagandizing activity. What is deemed important, in other words, is not that the Knights of Columbus (as an example of a private association) *is viewing a propaganda film,* but rather that the *Knights of Columbus* is viewing a propaganda film distributed by this foreign agent. Only by knowing the identity and thereby the number and importance of the organizations which the foreign agent has been successful in enlisting in the dissemi-

nation of his principal's propaganda can the public appreciate the scope and effect of the agent's propagandizing effort.

Secondly, it is not the showing of propaganda films that triggers public disclosure, but only the showing of propaganda films distributed by a foreign agent. The scope of *the agent's activities* is the focus of the Act and the implementing regulations. If an organization acquired the film directly from the government of Canada, for example, or from an importer who is not a foreign agent, the disclosure provisions would not apply. The restriction, in other words, is not upon the organizations' privacy in showing films, but upon the sources from which they may obtain films if they wish to show them in privacy. On balance, we cannot say that the incidental inconvenience imposed upon private associations desirous of retaining their confidentiality in the showing of foreign propaganda films is so severe as to invalidate the present scheme.

The other first amendment interest implicated is the right to privacy (or anonymity) in the *dissemination* of ideas—which again arguably extends to dissemination by associations (organizations and theaters) as well as by individuals. In *Talley v. California,* the Supreme Court held this right to be infringed by a requirement that the authors of political pamphlets identify themselves. "[T]here are times and circumstances," it said "when [the government] may not compel members of groups engaged in the dissemination of ideas to be publicly identified." 362 U.S. 60, 65, 80 S.Ct. 536, 539, 4 L.Ed.2d 559 (1960). *See also Rosen v. Port of Portland,* 641 F.2d 1243, 1251 (9th Cir.1981) ("The right of those expressing political, religious, social or economic views to maintain their anonymity is historic, fundamental, and all too often necessary.").

It seems to us inconceivable that the reporting requirement could have a substantial effect upon this associational interest. The showing of films is by its nature not an anonymous enterprise. Unlike pamphlets, which can be distributed incog-

nito on a street corner and passed from hand to hand thereafter, films require procuring an exhibition hall and publicizing the time and place of showings, activities not readily conducive to anonymity. Unsurprisingly, the anonymous exhibition of films has simply not "played an important role in the progress of mankind" as the distribution of anonymous pamphlets has. *Talley v. California,* 362 U.S. at 64, 80 S.Ct. at 538. Also unsurprisingly, there is no contention in this case that any of the appellants even seek to maintain their anonymity in exhibition of the films. Quite to the contrary, the very basis for their attack upon the classification of the films as "political propaganda" is the alleged impact that will have upon the public's willingness to attend the films' exhibition, and upon the public's estimation of them as exhibitors. At bottom, their complaint is simply that they do not want already extant public knowledge of their exhibition to be any more widespread than necessary—excluding access to this knowledge by the national press, for example, which is the most frequent user of the FARA's public record facilities. This seems less a vindication than a frustration of first amendment values.

In this respect, the case is analogous to *Uphaus v. Wyman,* 360 U.S. 72, 81, 79 S.Ct. 1040, 1046, 3 L.Ed.2d 1090 (1959), in which the government sought to obtain the list of guests who attended a World Fellowship summer camp. Noting that the names of the guests had already been made a matter of public record by virtue of a state statute requiring tourist camps to maintain a guest registration book open to inspection, the Supreme Court found that "however real in other circumstances," the first amendment privacy interest being asserted there was "tenuous at best," *id.* at 80, 79 S.Ct. at 1046 (citing *NAACP v. Alabama*), since the parties had "made public at the inception the association they now wish to keep private." *Uphaus v. Wyman,* 360 U.S. at 81, 79 S.Ct. at 1046. We conclude that the challenged provision's impairment of appellants' interest in anonymity of dis-

semination is, if existent at all, insubstantial.

\*　　\*　　\*　　\*　　\*　　\*

The District Court's dismissal for lack of jurisdiction is affirmed with respect to the claims relating to the requirement that registered foreign agents report the names of those to whom they transmit 100 or more copies of foreign political propaganda. In all other respects under appeal, the judgment of dismissal is reversed and the case remanded to the District Court with instructions to enter judgment for the defendants.

*So ordered.*