NATIONAL COMMITTEE TO PRE-
SERVE SOCIAL SECURITY,
Plaintiff,

v.

Otis R. BOWEN, et al., Defendants.

Civ. A. No. 88–0974.

United States District Court,
District of Columbia.

March 9, 1990.

Stephen L. Urbanczky, Williams & Connolly, Washington, D.C., for plaintiff.

Raymond M. Lariza, U.S. Dept. of Justice, Federal Programs Branch, Washington, D.C., for defendants.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., Chief Judge:

In this proceeding, the Court is confronted with serious questions relating to the administration and implementation of Section 232 of the Social Security Act of 1935, 42 U.S.C. §§ 301–1397e ("the Act") as related to the computation of a taxpayer's social security benefits. In a complaint seeking declaratory and injunctive relief, plaintiff, the National Committee to Preserve Social Security ("National Committee"), a nonprofit organization which has among its aims the protection of Social Security and Medicare programs, challenges the current wage recording system employed by the Department of Health and Human Services ("HHS"), the Social Security Administration ("SSA"), the Internal Revenue Service ("IRS"), and the Department of the Treasury ("Treasury"). Plaintiff alleges that under the current wage recording system a vast number of workers, past and present contributors to the Social Security fund under the Act, have earned and paid taxes on billions of dollars which have not been credited to their Social Security wage accounts. The result, alleges the plaintiff, is that eligible workers are either currently losing or faced with continued or future losses in their Social Security benefits.

National Committee challenges not only the government's reliance upon the Social Security wage account recording system, but also its failure to comply with the notice and comment requirements of the Administrative Procedure Act ("APA"). 5 U.S.C. § 553, as applied to Section 232 of the Act. APA Section 553 provides that after notice of proposed rulemaking is published in the Federal Register, the agency grants interested persons an opportunity to participate and comment through submissions of written data, views, or arguments. After the agency considers the relevant matters presented, it incorporates in the adopted rules a concise general statement of the basis and purpose of the adopted rules.

The government has moved to dismiss the complaint for lack of subject matter jurisdiction. Plaintiff asserts 28 U.S.C. § 1331, the federal question provision, as a basis for this Court's jurisdiction. The government argues that this lawsuit is merely a disguised claim for benefits and, therefore, federal question jurisdiction is precluded by Section 205(h) of the Act. Section 205(h) provides that no action against the United States shall be brought under Section 1331 to recover on any claim arising under the Act. The government also moves to dismiss the complaint on grounds that mandamus jurisdiction, 28 U.S.C. § 1361, does not lie here and that National Committee lacks standing to bring this suit.

For the reasons discussed below, this Court rejects the government's arguments and denies its motion to dismiss.

## I. BACKGROUND

Under the provisions of section 205(a) of the Act, the Secretary is authorized to promulgate the rules, regulations, and procedures to be utilized in establishing the rights and benefits due contributors to the fund.

The earnings of workers, whose employment is covered by the Act, are subject to certain reporting procedures. Employers

send earnings data reports to the SSA, which in turn credits the worker's reported earnings to his individual account. Eligibility and the amount of benefits the worker is entitled to receive are determined by the worker's lifetime earnings as documented by the SSA.

Prior to 1978, Department of Treasury regulations required employers to submit quarterly reports of employee wages subject to social security taxes. Under the regulations:

These reports, on Treasury Form 941–A, ... list[ed] each employee by name, social security account number, and total wages paid to the employee with respect to which social security taxes are payable. The preparation and filing of this quarterly report involve[d] considerable effort and expense on the part of employers particularly in the case of small and medium-sized companies which d[id] not have the advantage of computerized payroll systems.

S.Rep. No. 550, 94th Cong., 1st Sess. 9 (1975), U.S.Code Cong. & Admin.News 1975, pp. 2347, 2355.

In response to employers' concerns Congress amended the Act by adding Section 232 enacted on January 2, 1976. The law, which took effect in 1978 [1], eliminated the quarterly, individualized wage data reports and implemented an annual wage reporting system. Under this system, employers continue to file quarterly 941 summaries with IRS, but IRS no longer receives or sends the SSA quarterly reports documenting the wages earned by individual employees. Instead, once a year, employers submit W–2 and W–3 forms [2] directly to the SSA. The SSA then records this information in the appropriate individual wage accounts and forwards the W–2 and W–3 information directly to the IRS. The IRS compares these W–3 wage totals to the 941 wage totals. The total of each employer's quarterly reports to the IRS should equal the total earnings that an employer annually reports to the SSA.

In its complaint, National Committee argues that under the old reporting system employers prepared a quarterly set of personalized wage data reports which the IRS and SSA shared. Under the new authorized wage reporting system, however, employers submit different sets of data to the IRS and the SSA in different form, prepared at different times of the year. The IRS receives *quarterly* summaries of aggregate wages paid and the SSA receives an *annual* list of wages received by each individual employee. The result, argues the plaintiff, is an increased opportunity for error in calculating an individual's Social Security benefits.

Indeed, on September 18, 1987, the General Accounting Office released a report entitled "Social Security: More Must Be Done to Credit Earnings to Individuals' Accounts", HRD–87–52 ("GAO Report" or "Report"). According to the Report, from 1978 through 1984 the total earnings amounts recorded by each agency has differed significantly. As of March 1987, the SSA had recorded approximately $58.5 billion *less* in total employee earnings than the IRS had recorded for the *same period*. Thus, taxes on the $58.5 billion in wages were duly paid to the IRS but were *not* properly credited to individual earnings accounts in the SSA's records. The Report noted that "[a]lthough the number of workers affected is not known, we estimate that this backlog of unreconciled differences could affect about 9.7 million workers." [3]

1. The effective date was postponed "so that the Committee on Social Security [could] work out any problems they might have during the coming year. This also afford[ed] [the House] an opportunity to consider the recommendations of the Departments of Treasury and Health, Education, and Welfare concerning this matter and public reaction to these proposals." *Id.*

2. W–2 forms provide individual employee earnings and Social Security benefits for that tax year. W–3 forms provide an aggregate summary of wages paid and taxes withheld.

3. An amicus brief in support of plaintiff's opposition to defendants' motion to dismiss was filed by five members of the United States House of Representatives. It indicated that the "SSA recently reported that 2.1 million unrecorded employer reports had accumulated during tax years 1984–86, in addition to the 3.5 million backlogged cases from 1978–1983." Brief of Amicus Curiae in Support of Plaintiff's Opposi-

To address this reconciliation problem, the SSA adopted "tolerance levels" below which no reconciliation is initiated as the amounts at issue are deemed insignificant. Plaintiff claims that these tolerance levels were adopted without publication or an opportunity for public comment as required under the APA.

Plaintiff also argues that after the enactment of the new legislation which authorized the IRS and the SSA to enter into a cooperative agreement embodied in a Memorandum of Understanding ("MOU"),[4] the government should have provided the public with general notice of the proposed rule by publishing the MOU in the Federal Register thereby providing interested persons with an opportunity to comment. And not having done so is alleged to be yet another failure by the government to meet the notice and comment requirements under APA Section 553.

National Committee claims that both the IRS and the SSA have acknowledged the validity of the GAO Report. The two agencies had acknowledged, both before and after the Report was issued, that grave problems exist with the current annual wage reporting system. The wage reconciliation problem has existed for over ten years and has been characterized by chronic agency inaction and delay.[5] Although the IRS and the SSA have known about this problem for years, they have made little or no effort to attempt to resolve the problem.[6]

## II. LEGAL ANALYSIS

### A. *Subject Matter Jurisdiction*

■ In its seminal ruling, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) the Supreme Court stated that the Administrative Procedure Act "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" In *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) the Supreme Court explained the extent of this presumption of reviewability. It declared that under Section 701[7] of the APA, each authority of the Government of the United States is subject to judicial review unless there is a statutory prohibition on review or where "agency action is committed to agency discretion by law." *Id.* at 410, 91 S.Ct. at 820. It also declared that the "committed to agency discretion" is a very narrow one—the legislative history of the APA indicates that it is applicable only in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply." S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945). More recently, the Supreme Court, in upholding the Sixth Circuit's decision in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986)[8], reinforced the doctrine

tion to Defendants' Motion to Dismiss, (Dec. 16, 1988) ("Amicus") at 2.

4. The MOU details the responsibilities and procedures for comparing wage and tax data and for reconciling differences in the reports.

5. Amicus at 1.

6. On July 12, 1988, this status changed as the IRS and the SSA entered into a new MOU providing for a more timely and improved reconciliation process. Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Defendants' Motion to Dismiss"), (Aug. 5, 1988) pp. 17–19.

7. Section 701 of the APA provides that judicial review applies to any government authority except to the extent that statutes preclude judicial

review or the law provides that agency action is committed to agency discretion.

8. This case has had an extensive history. In the Sixth Circuit's initial opinion, *Michigan Academy of Family Physicians v. Blue Cross and Blue Shield of Michigan*, 728 F.2d 326 (6th Cir.) vacated and remanded, 469 U.S. 807, 105 S.Ct. 65, 83 L.Ed.2d 16 (1984), it held that the district court had jurisdiction to hear the challenge brought by Michigan Academy. Following the consideration of the remand by the Supreme Court, the Sixth Circuit entered an order remanding the case to the district court for reconsideration in light of *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). 751 F.2d 809. Appellees then petitioned for reconsideration of the Sixth Circuit's remand order and the Court found that federal question jurisdiction existed 757 F.2d 91 (6th Cir.1985), aff'd

and held that there is a *"strong presumption* that Congress intends judicial review of administrative action ... 'our cases [have established] that judicial review of a final agency action by an aggrieved person will *not* be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" *quoting Abbott Laboratories,* 387 U.S. at 140, 87 S.Ct. at 1511 (emphasis added).[9]

Congress, however, may make exceptions to this traditional practice. Since judicial review of administrative action is a presumption, it can be overcome by specific language, through legislative history, or any other reliable indicator of congressional intent. *See Block v. Community Nutrition Institute,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2459, 81 L.Ed.2d 270 (1984). However, if any "substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Id.* at 351, 104 S.Ct. at 2456.

In this proceeding, the government argues that Section 205(h) expressly excludes all administrative or judicial review not otherwise provided in the statute. Therefore, it alleges that the wage recording system does not fall within the grant of federal question jurisdiction found in 28 U.S.C. § 1331. This argument is unpersuasive.

■ Section 205(h) provides that no action shall be brought against the United States, or any official, under Section 1331 to recover any claim arising under the Act. The section does not govern *procedural* challenges to statutes or administrative policies; rather it applies only to *personal* claims of workers for *benefits* under Title II of the Act. *See National Association of Home Health Agencies v. Schweiker,* 690 F.2d 932 (D.C.Cir.1982) (statute governing finality of HHS Secretary's decisions did not preclude review of regulation requiring home health agencies to seek medicare reimbursement determinations); *Humana of South Carolina, Inc. v. Califano,*

590 F.2d 1070 (D.C.Cir.1978) (claim was not precluded by Section 205(h) as hospital's challenge of medicare regulation was not directed at demonstrating unreasonableness of benefit amounts but was a procedural attack aimed at showing that Secretary failed to adhere to methodology generally applicable to rulemaking effort). Therefore, to the extent that a plaintiff's claim seeks to recover Social Security *benefits,* "federal question jurisdiction is clearly foreclosed." *Soberal–Perez v. Schweiker,* 549 F.Supp. 1164, 1168 n. 7 (E.D.N.Y.1982), *aff'd* 717 F.2d 36 (2d Cir.1983) *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984).

This action does not arise from a claim for additional benefits; rather it stems from plaintiff's ultimate goal of "vindicat[ing] an interest in procedural regularity." *Humana of South Carolina, Inc.,* 590 F.2d at 1080. Plaintiff's entire argument rests on challenging the rule used to determine an employee's Social Security benefits and the procedure under which that rule was promulgated. Therefore Section 205(h), by its own terms, is inapplicable to this proceeding as it neither involves any findings of fact nor any decision by the Secretary on a claim for benefits. *See National Association of Patients on Hemodialysis and Transplantation, Inc. v. Heckler,* 588 F.Supp. 1108, 1117 (D.D.C. 1984) (§ 205(h) inapplicable to bar suit where plaintiff's challenge involved no findings of fact or any decision by Secretary for a benefits claim and no other form of review was available to challenge regulations); *Colonial Penn Ins. Co. v. Heckler,* 721 F.2d 431, 439 (3rd Cir.1983) (permitting judicial review to challenge regulations making Medicare benefits secondary to insurance coverage). Furthermore, this Circuit has continually held that Section 205(h) does *not* preclude judicial review of claims which challenge the Secretary's compliance with the APA. *Humana,* 590

sub nom. *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

9. See also, Note, Congressional Preclusion of Judicial Review of Federal Benefit Disbursement: Reasserting Separation of Powers, 97 Harv.L.Rev. 778 (1984).

F.2d at 1080; *National Association of Home Health Agencies,* 690 F.2d at 940.

Nevertheless, the government relies principally on *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) and *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) for the proposition that plaintiff's claims "arise under the Act"; therefore plaintiff is not only barred from review under Section 1331 but also must exhaust its administrative remedies. The government's reliance on these cases is misplaced as plaintiff's claims not only do not arise under the Act but also can be distinguished from these cases.

*Ringer* involved four individual Medicare claimants who challenged an administrative ruling denying medicare benefits for a specific type of surgical procedure. The court held that the "inquiry in determining whether § 405(h) bars federal question jurisdiction must be whether the claim 'arises under' the Act not whether it lends itself to a 'substantive' rather than a 'procedural' label." *Ringer,* 466 U.S. at 615, 104 S.Ct. at 2021. The court found that plaintiffs tried to avoid the Act's exhaustion requirements by disguising their substantive benefit claims as procedural ones. Under these circumstances the court found that Section 205(h) barred plaintiffs' procedural claims which it found to be "inextricably intertwined" with their benefit claims. *Id.* at 614, 104 S.Ct. at 2021.

In *Salfi,* after appellee-widow's husband of less than six months died, she filed applications for mother's Social Security insurance benefits for herself and child's insurance for her daughter by a previous marriage. When the SSA denied both applications on the basis of its duration-of-relationship requirements [10], widow and child brought a class action seeking declaratory and injunctive relief on behalf of all widows and stepchildren denied benefits because of the nine month requirement. A three judge district court held that it had federal question jurisdiction under Section 1331. The Supreme Court, however, held that the district court did not have federal question jurisdiction. It construed the "arising under" language of Section 205(h) very broadly to include "any claims in which 'both the standing and the substantive basis' for the presentation of the claims is the Social Security Act." *Id.* 422 U.S. at 760, 95 S.Ct. at 2464. It is this interpretation of "arising under" that the court in *Ringer,* and the government here, rely upon to preclude jurisdiction under Section 1331.

The present case is distinguishable from *Ringer* on its facts. Nowhere in the complaint does plaintiff raise a substantive claim for benefits. The claims raised in this proceeding are not "inextricably intertwined" with a claim for benefits and there is no intermingling of substantive and procedural claims. Plaintiff does not seek an award for benefits; therefore this Court is not faced with the *Ringer* court's problem of plaintiffs circumventing the requirement of exhausting administrative remedies. Plaintiff seeks a procedural reform of the wage recording system, agency compliance with statutory obligations to maintain accurate records, and agency compliance with the APA's notice and comment requirements.

Furthermore, it does not necessarily follow that this litigation will result in an increase in an employee's amount of Social Security benefits. Plaintiff simply seeks an *accurate* calculation of individual Social Security benefits. Although it is likely that an accurate calculation could result in an increase in benefits for some contributors, it is also likely that others could experience no change or even a decrease. *See Michigan Academy of Family Physicians v. Blue Cross and Blue Shield of Michigan,* 728 F.2d 326, 330 (6th Cir.) *vacated and remanded,* 469 U.S. 807, 105 S.Ct. 65, 83 L.Ed.2d 16 (1984). Even in view of the Supreme Court's ruling in *Salfi* that "arising under" is to be construed broadly, and even if, tangentially, an increase in benefits resulted from this litigation, it is clear that

---

**10.** These requirements defined "widow" and "child" to exclude surviving wives and stepchildren who had respective relationships with the deceased wage earner for less than nine months prior to death.

*Salfi* is not to be construed "to foreclose *all* direct district court review merely because an incidental effect of a favorable decision may be increased benefits to plaintiffs." *Good Samaritan Medical Center v. Heckler*, 605 F.Supp. 19, 23 (S.D.Ohio 1984) (court had subject matter jurisdiction over rural hospitals' constitutional challenge to statute despite Secretary's contention that hospitals first had to exhaust administrative remedies) (emphasis added). *Accord Samaritan Health Center*, 636 F.Supp. at 511; *National Association of Patients on Hemodialysis*, 588 F.Supp. at 1116.

Assuming, *arguendo*, that the government's reading of *Ringer* and *Salfi* is correct, "it would mean that *any* procedural dispute which had even the most *tangential* affect on [benefits and] reimbursement amounts would be precluded from judicial review." *Bio–Medical Applications of Providence v. Heckler*, 593 F.Supp. 1233, 1236 (D.D.C.1984) *aff'd* 776 F.2d 365 (D.C. Cir.1985) (action challenging Secretary's promulgation of rule affecting amount of reimbursement was not precluded from judicial review because action was to vindicate procedural rights and not for additional reimbursement). Finally, it is clear to this Court that the government's position conflicts with the "time-honored tradition for the Supreme Court and lower federal courts to find that Congress did not intend to preclude altogether judicial review of constitutional claims in light of the serious due process concerns that such preclusion would raise." *Bartlett v. Bowen*, 816 F.2d 695, 699 (D.C.Cir.1987) (statutory provision precluding all judicial review over constitutional issues removes courts from essential function under implied constitutional mandate of Separation of Powers).

This Court is persuaded by the Sixth Circuit's decision in *Michigan Academy of Family Physicians v. Blue Cross & Blue Shield of Michigan*, 757 F.2d 91 (6th Cir. 1985), *aff'd sub nom. Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). There plaintiffs, service providers under Medicare, brought suit challenging the method by which HHS determined reimbursement for certain individuals. Plaintiffs alleged that classifying family physicians separately from other physicians with similar qualifications violated their Medicare, due process and equal protection rights under the Fifth Amendment. Defendants argued that plaintiffs' claim was nothing more than a claim for increased reimbursement; therefore it was foreclosed from subject matter jurisdiction under Section 205(h). Both the district court and the Sixth Circuit held that federal question jurisdiction existed to hear plaintiff's challenge. After the Sixth Circuit's order remanding the case for reconsideration in light of *Ringer* and appellees petition for reconsideration of the remand order, the Sixth Circuit again held that federal question jurisdiction existed. In reaching its result, the Sixth Circuit distinguished *Ringer* and held that:

> [W]e incline to the time-honored view that a right cannot exist in a vacuum and that for every right there must be a remedy. As we said in our earlier opinion herein, 'Given the presumption favoring judicial review and absent a clear and convincing showing that Congress intended the contrary, we conclude that [federal question jurisdiction exists under 28 U.S.C. § 1331].' 728 F.2d at 331. We further conclude, as did Judge Kinneary in *Good Samaritan Medical Center v. Heckler, supra,* that the Supreme Court in *Heckler v. Ringer, supra,* did not proscribe judicial review to challenges to the Medicare Act where the challenge was made by a party other than a claimant for benefits.

*Id.* at 94.

■ *Michigan Academy* is in all respects strikingly similar to this proceeding. Here, plaintiff challenges the authorized wage reporting system instituted by the Secretary and the procedures under which that system was promulgated. This Court finds, as did the court in *Michigan Academy*, that a strong presumption favoring judicial review exists and that absent a convincing showing by the government of Congressional intent to the contrary, federal question jurisdiction exists here. Fur-

thermore, in light of the fact that Congress did not specifically provide any review mechanism of the Secretary's decisions in this type of case, to adopt the government's view would be to accept that the Secretary has unrestrained discretion to promulgate *any* rule or prevailing regulation he chose. Certainly, the absence of a review mechanism cannot be interpreted as congressional intent to vest the Secretary with unbridled discretion nor can Congress' silence be interpreted as creating a jurisdictional bar to this Court's power to hear potential claimants who would otherwise be without a remedy.

■ Relying on *Ringer*, the government also argues that plaintiff must first exhaust its administrative remedies under § 205(g) before it can contemplate bringing an action in district court. *Ringer*, 466 U.S. at 619 n. 12, 621, 627, 104 S.Ct. at 2024 n. 12, 2025, 2028. Section 205(g), however, calls for the exhaustion of administrative remedies prior to obtaining judicial review of a *"final decision* of the Secretary made *after* a *hearing* to which he was a party."* (emphasis added). Here, plaintiff was not a party to a hearing before the Secretary and there is no final decision. Therefore, Section 205(g) is wholly inapplicable to this proceeding. *See Attorney Registration and Disciplinary Com'n v. Schweiker*, 715 F.2d 282, 288 (7th Cir.1983) (suit could not be maintained under review provision of the Act where no past or future employees of plaintiff's met § 205(g) requirements).

Furthermore, the section is simply not designed to adequately address the systemic, procedural challenges that plaintiff raises—challenges that are completely unrelated to any substantive benefit determination. Section 205(g) was designed for the review of individual benefit claims and not for the types of claims raised in this proceeding. Certainly, an employee who desires to correct errors in his record or who contests his Social Security benefits because they fail to accurately reflect his earnings can pursue an individual claim under that section. Yet, that same employ-

ee would have virtually no opportunity to challenge, and no way of knowing, the procedural flaws in the wage recording system that produced his errors.

Even if an employee succeeded in correcting errors in his record via an administrative proceeding under Section 205(g), this success would provide no protection from future errors stemming from the same systemic flaws. *Cf. Stieberger v. Heckler*, 615 F.Supp. 1315, 1337 (S.D.N.Y. 1985) (Act fails to provide an adequate alternative for remedying plaintiff's challenges where "[e]ven if individual claimants were to succeed in obtaining an award of benefits, the policies of which they complain would remain in place and continue to effect other similarly situated claimants"). Thus, the procedural irregularity would remain unaddressed despite plaintiff's exhaustion of administrative remedies and despite an individual vindication.[11]

After fully considering the government's arguments, this Court is not only persuaded by *Michigan Academy* but also finds that *Ringer* is not binding precedent. As previously discussed, *Ringer* can be distinguished on its facts and it must be read and applied in light of the well-established principle concerning the presumption of judicial review. Thus, this Court concludes that plaintiff's claims do not arise under the Act and therefore are not barred from judicial review by Section 205(h). To hold otherwise, as defendants invite this Court to do, would unfairly and unwisely bar all direct attacks upon the Secretary and the Act. Certainly, Congress did not intend Section 205(h) to have such an unduly sweeping effect. Therefore, the government's motion to dismiss for lack of subject matter jurisdiction is denied.

### B. *Mandamus Jurisdiction*

■ Until 1962, federal district courts were without jurisdiction to issue mandatory orders to correct any abuse of authority by federal officials. *See* 7 J. Moore, J. Lucas & K. Sinclair, Moore's Federal Practice ¶ 81.07 (2d ed. 1986). In that year,

---

**11.** "The fortuity of individual recompense should not result in evasion of review of a collateral procedural issue." *Mental Health*

*Ass'n v. Heckler*, 720 F.2d 965, 971 (8th Cir. 1981).

Congress enacted Section 1361 to Title 28 which provided:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

Generally, this provision expanded the district courts' jurisdiction to hear suits brought to compel a federal officer to exercise a duty. Previously, such suits were maintainable only in the District Court for the District of Columbia. *Id.*

In *Ellis v. Blum*, 643 F.2d 68, 78 (2d Cir.1981), the Second Circuit noted that there is an impressive array of cases from a number of circuits which hold that § 1361 provides a jurisdictional basis to review *procedures* employed in administering Social Security benefits. *See, e.g., Belles v. Schweiker*, 720 F.2d 509, 511 (8th Cir.1983); *Kuehner v. Schweiker*, 717 F.2d 813, 819 (3d Cir.1983); *Sharpe v. Harris*, 621 F.2d 530 (2d Cir.1980); *Frost v. Weinberger*, 515 F.2d 57, 62 (2d Cir.1975). In *Ganem v. Heckler*, 746 F.2d 844 (D.C.Cir.1984), this Circuit joined the consensus of the circuit courts by holding that mandamus is not precluded by the Act. In *Ganem*, our Circuit Court stated that mandamus generally will not issue unless there is: (1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and nondiscretionary duty on the part of the defendant to honor that right, and; (3) no other adequate remedy, either judicial or administrative, available. *Id.* at 852. Here, the government argues that plaintiff is not entitled to mandamus jurisdiction as these criteria are not met. After a careful consideration of this argument and in light of the persuasive caselaw, the Court finds that even if federal question jurisdiction does not lie here, certainly mandamus jurisdiction exists under Section 1361.[12]

The government argues that it does not owe a mandatory duty to the plaintiff, as the Act fails to specifically address a recon-

ciliation process for handling discrepancies in employee earnings. Yet, even if Congress failed to specify the details of a reconciliation process, this does not automatically allow agencies to ignore the important and essential duties that Congress entrusted to them. In fact, in *Estate of Smith v. Heckler*, 747 F.2d 583, 591 (10th Cir.1984), the Tenth Circuit held that mandamus relief was appropriate to compel HHS Secretary to perform her duty of promulgating regulations that would inform her of the quality of medical care given by federally funded nursing facilities:

> [I]t is the court's duty in a mandamus action to measure the allegations in the complaint against the statutory and constitutional framework to determine whether the particular official actions complained of fall within the scope of the discretion which Congress accorded the administrators.... In other words, even in an area *generally left* to *agency discretion*, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised.... If, after studying the statute and its legislative history, the court determines that the defendant official has *failed* to discharge a *duty* which Congress *intended* him to perform, the court should compel performance, thus effectuating the congressional purpose (citations omitted) (emphasis added).

Therefore, even if Congress *failed* to specify the details of the reconciliation process and arguably left this area to the SSA's or IRS's discretion, this Court can still find that the Secretary failed to discharge a duty that Congress intended it to perform. Even if a written, statutory duty does *not* exist, this Court can find that Congress intended the Secretary to perform a necessary function.

 It should not be overlooked that the Act requires the Secretary to "establish and maintain" records of employee wages. 42 U.S.C. § 405(c)(2)(A). These wage

---

**12.** In fact, in cases like these, federal courts commonly exercise mandamus jurisdiction "when the dispute does not involve entitlement

to benefits per se." *Linquist v. Bowen*, 813 F.2d 884, 888 n. 12 (8th Cir.1987).

records are not only used for calculating Social Security benefits but also for allocating money to Social Security trust funds—the pool from which these benefits are paid. There is a direct relationship between wages earned and benefits paid, therefore accurate records are essential. In fact, Judge Gesell of this Court stressed the importance and necessity of the government maintaining accurate records:

> Accuracy of government-recorded personnel information is particularly important in our complex and bureaucratically-interrelated society, where an individual's rights and benefits may well be influenced or determined by what some government agency has to say about him. The *prejudice* resulting from inaccuracy may affect determinations reached by third parties, public or private, as well as those made by the recordkeeping agency.... it may be necessary to eliminate clear mistakes of fact or irresponsible judgment from an individual's file so as *not* to prejudice prospects for a fair determination of his rights or benefits.

*R.R. v. Department of Army*, 482 F.Supp. 770, 773 (D.D.C.1980). Indeed, it would be ironic and even absurd if Congress established a massive record keeping system, used each year for the governmental collection and disbursement of billions of dollars, with no clear intent that these records be accurate. Although Section 205(c)(2)(A) does not identify the means for verifying wage reports, it does present the Secretary with a clear obligation to keep accurate records.[13]

Nevertheless, the government argues that the Secretary is under no statutory duty to maintain accurate records. Therefore, even if National Committee could establish the existence of some statutory duty, it could not satisfy the third mandamus requirement as administrative remedies can fully redress its injuries. In fact, the government alleges that the Act places the burden on *individual employees* to save their W–2 forms, check their SSA records and keep track of inaccuracies in their Social Security benefits. This position is not only onerous and unfair but also prejudicial to the individuals that the Act was designed to benefit.

Undoubtedly, the Social Security Act was designed to protect the elderly. One can fairly conclude that a vast majority of senior citizens can potentially be frightened, confused, and overwhelmed by bureaucratic and administrative procedures. They place considerable trust in the government. Hence, "the elderly and generally poor plaintiffs ... justifiably rely on the [g]overnment to properly fix their OASDI benefits, [and] they cannot be expected to seek professional services to review the checks and statements received each month." *Id.* at 604. *See also Gray Panthers v. Schweiker*, 652 F.2d 146, 149 (D.C. Cir.1980); *Ellender v. Schweiker*, 575 F.Supp. 590, 601 (S.D.N.Y.1983).

There is no doubt that the reconciliation problem is a clear, direct and obvious result of the 1978 shift to the annual wage reporting system.[14] Clearly Congress never meant for the Act's self-policing mechanism to act as a substitute for the govern-

---

**13.** On December 1, 1988, plaintiff's filed a supplemental memorandum in opposition to the government's motion to dismiss, which set forth the Privacy Act. 5 U.S.C. § 552a, as an added jurisdictional basis for plaintiff's claims. Plaintiff argues that jurisdiction exists under § 522a(e), (g)(1) of the Privacy Act based on the government's failure to maintain accurate records of employee earnings. Here, National Committee challenges the government's use and implementation of the annual wage reporting system. The Privacy Act, however, authorizes the court to issue injunctions in only two instances: to amend an individual's record and to order an agency to produce agency records that were improperly withheld from an individual. *See* 5 U.S.C. §§ 552a(g)(2)(A), 552a(g)(3)(A).

Plaintiff's claims do not fall within this narrow grant of power. Therefore, this Court is persuaded by our Circuit's decision in *Hastings v. Judicial Conference of the United States*, 770 F.2d 1093, 1104 (D.C.Cir.1985) which held that an individual is not entitled to any form of relief which is not among those expressly made available under the Privacy Act.

**14.** "Whether one considers the problem to be inherent in the reporting system, or the result of inadequate agency implementation, it was the change in government reporting requirements that caused the [reconciliation] problem." Amicus at 4.

ment's obligation to maintain accurate records. Congress placed the responsibility to maintain accurate records with the agencies and not with the fund's contributors: its employers or employees. The agencies are in the best position and certainly are better equipped to monitor, review and correct these errors. Furthermore, they have sufficient funding to do so. Even if it was Congress' intent to shift this burden onto the contributors, this mechanism does not address plaintiff's challenge to curtail the continuing, systematic errors that are produced under the current wage recording system. To permit the shift of burden advocated by the government is to burden individual employees [15] many of whom are unsophisticated, unprepared, and unable to successfully fight for an accurate recording of their benefits. Countless wage earners would lose and continue to lose credits because of the government's administrative errors. The government's argument conflicts with the general purposes of the Act to provide not take away or prohibit benefits to the elderly:

> The Social Security Agency ... is not dealing at arm's length with those who are entitled to participate under the Act. The benefits are not largesse but a matter of right. The Agency has a responsibility to effectuate its purposes and to see that those who are entitled to its benefits do not surrender them unwittingly through inadvertence or technicality.

*Perli v. Schweiker*, 543 F.Supp. 394, 397 (S.D.N.Y.1982).

Furthermore, these Americans—individuals who are *rightfully entitled* to their Social Security benefits and its accurate recording—should not have to suffer because of problems that lie squarely with the government. As Representative J.J. Pickle noted:

> The fault has been the government's. The fault is in [the] SSA and [in the IRS] in not getting these wage records. No matter how you slice it, no matter whether Congress has been negligent in not overseeing [it], the fact of the matter is, we haven't done it, and the fault is *not* the employees'—it's us, the government.

*Joint Hearing on the Crediting of Wages: Hearing Before Subs. on Oversight and Social Security, House Committee on Ways and Means*, 100th Cong., 2d Sess. (1988) (statement of Rep. J.J. Pickle). The government's interpretation would not only place an unfair burden on these Social Security recipients, but also undercut the basic purpose of the Act.

Agencies must also ensure that the procedures and regulations that they promulgate satisfy constitutional due process requirements. It is a Fifth Amendment issue whether the procedures satisfy constitutional due process. *See Elliot v. Weinberger*, 564 F.2d 1219, 1226 (9th Cir.1977) *aff'd in part, rev'd in part on other grounds sub nom. Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The Secretary has no discretion to provide any less than the minimum of what is constitutionally required. *Id.* In fact, several courts have held that courts have the discretion to exercise mandamus jurisdiction to compel compliance with constitutional requirements while not interfering with the exercise of an agency's discretionary powers. *Mental Health Ass'n*, 720 F.2d at 971 n. 17 ("Thus the claim raised is procedural in nature and the order would not infringe the Secretary's duly delegated authority to make eligibility determinations."); *Stieberger*, 615 F.Supp. at 1335 (mandamus jurisdiction appropriate where claimants had no available adequate alternative and Court concerned only with whether the Secretary had adhered to requirements of procedural fairness in rendering disability determinations); *Blum*, 643 F.2d at 82 (mandamus jurisdiction exists where plaintiff raises "procedural challenge, the adjudication of which will not

---

**15.** Not surprisingly, the majority of individuals most affected by the SSA's inaccurate wage recordings are the poor and disadvantaged. In its complaint, plaintiff states: "SSA has conceded that, '[a]s most of these [missing and discrepant employer] reports are for wage amounts under $10,000, our failure to post these earnings correctly, adversely affects those *most* in need of Social Security program coverage.'" (citations omitted) (emphasis added) (Complaint, ¶ 19.)

affect the substantive question of continued entitlement to disability payments.")

Plaintiff's procedural challenges to the government's failure to implement an appropriate wage recording system and its noncompliance with the notice and comment requirements of the APA are well within the class of claims for which mandamus jurisdiction is suited. Plaintiff contends that the new wage reporting system increases the opportunity for error in calculating an individual employee's benefits. This claim relates to the method or formula used by the IRS and the SSA in calculating Social Security benefits. It does not relate to an increase or decrease in the actual amount of an individual's benefits. The underlying merits of a particular claimant are irrelevant and unrelated to this present proceeding. The government completely misses the mark when it argues that jurisdiction would be tantamount to an award of benefits. *Cf. Ringer, supra.* An exercise of mandamus jurisdiction will not infringe upon the substantive or discretionary powers of the IRS or the SSA. Therefore mandamus can be used to compel the agencies compliance with its constitutional requirements.

The government also argues that the third requirement of mandamus jurisdiction i.e., no other adequate remedy, is not met. It argues that an adequate remedy for any alleged denial of information is available to plaintiff under the Freedom of Information Act ("FOIA"). If plaintiff is dissatisfied with the agency's response, FOIA creates a cause of action to enjoin the withholding of agency records and to order protection of unlawfully held agency records. 5 U.S.C. § 552(a)(4)(B). This argument is not persuasive, as FOIA requests, made several years *after* key decisions are made cannot be relied upon as an adequate alternative to government compliance with its statutory obligations. Certainly, the government cannot expect plaintiff's access to information after-the-fact to substitute for the opportunity to influence agency decisions before they are made.

## C. *Standing*

 The government's argument that the National Committee lacks standing is flawed and ignores the longstanding precedent to the contrary. In *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) the Supreme Court noted that:

> Even in the absence of injury to itself, an association may have standing *solely* as the representative of its members ... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit ... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

Later, in *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the Supreme Court reaffirmed the principle of associational standing by holding that an association has standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Accord International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 288, 106 S.Ct. 2523, 2531, 91 L.Ed.2d 228 (1986) (union and union members had standing to litigate suit regarding interpretation of guidelines promulgated under Trade Act of 1974).

The government argues that an important *Hunt* requirement has not been satisfied because no individual member of National Committee, would have standing to maintain an action in his own right. It

argues that the Separation of Powers doctrine precludes a finding that individual wage earners have standing to maintain an action as the case and controversy requirements of Article III are not met. The government's argument is not persuasive.

In *Hazardous Waste Treatment Council v. U.S. Environmental Protection Agency, et. al.*, 861 F.2d 270, 273 (D.C.Cir. 1988) our Circuit recognized an organization's standing if it could show that "its members have personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision." *Accord Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (organization dedicated to separation of church and state lacked standing as they failed to identify any personal injuries suffered as a consequence of alleged constitutional error in transfer of federally owned property to religious organization). The government does not deny that individual wage earners have been and will be injured. Rather, it argues that inaccuracies did not stem from government actions but from the failure of employers to submit accurate earnings reports to the SSA. Certainly, when an employer submits wage reports it serves an important role in the recording system. This role, however, is specifically formulated and dictated by the imposed statutory, reporting requirements of the agency. The government quickly forgets that it is because of the annual wage reporting system, initiated in 1978, requiring employers to submit separate wage reports to both the IRS and SSA, that disparities between the agencies' records have increased significantly. This statutory change in the employer's reporting obligations, coupled with the agencies' failure to adequately and efficiently accommodate this change, has produced a substantial increase in the number of disparities in wage records. Under the circumstances, it is disingenuous for the government to argue that the inaccuracies were caused *sole-* ly by the employers. Furthermore, even if the inaccuracies were initially caused by the employers' wage reports, the government is in a better position to correct them after they have been submitted to the agency.

The government also argues that since the inaccuracies allegedly occurred from the actions of individual employers, then any resulting injury is indirect. Relying solely on *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the government argues that even through plaintiff's claim may be judicially cognizable, if the injury resulted not from the challenged governmental conduct but from the conduct of third parties then the causation elements of Article III are not met and standing does not exist. In *Wright*, the Supreme Court held that the parents of black children who were attending public schools in states undergoing segregation, lacked standing to challenge the guidelines and procedures used by the IRS in determining whether a private school has engaged in racially discriminatory practices to thereby denied its tax exempt status. Plaintiffs failed to allege personal injury traceable to defendants' allegedly unlawful conduct. Here, the government argues that Article III of the Constitution requires that an individual allege an "actual or threatened injury" that can be fairly traced to the challenged action and is likely to be redressed by a favorable decision. It argues that Separation of Powers precludes a finding that individual wage earners have standing to maintain the present action.

It is well settled, that a plaintiff has standing to challenge any conduct that indirectly results in injury. In *National Wildlife Federation v. Hodel*, 839 F.2d 694, 705 (D.C.Cir.1988) our Circuit court stated: "We are concerned here *not* with the length of the chain of causation, but [with] the plausibility of each of the links that comprise the chain." (emphasis added). In this action, even though an employee's injury may be traced to an employer's failure to submit an accurate earnings report to the SSA, this does not serve as a basis to defeat plaintiff's standing to bring an ac-

tion. The presence of an intermediary in the causation chain, here the employer, is insufficient to deny the necessary causation to establish standing.

Furthermore, even if the employers could be classified as intervening agents in the wage recording system, this still would not be sufficient to defeat plaintiff's standing. This Circuit, in *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 51 n. 5 (D.C.Cir. 1988) found that an animal protection agency had standing to challenge a decision which expanded hunting rights to wildlife refuges, even though injury arguably resulted from the hunters' response to a governmental decision:

> The requirement of fair traceability, or causation, is readily satisfied in this case: the killing of refuge-dwelling animals *directly stems* from the Wildlife Service actions authorizing hunting of such prey. It is no defense to suggest that the presence of autonomous intervening agents in the form of hunters defeats plaintiff's standing to mount such a challenge.

*See also National Wildlife Federation*, 839 F.2d at 705–06 ("mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice.") In fact, if the government's argument were true, many traditional suits would fail for lack of standing:

> It is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons. If that principle were true, it is difficult to see how libel actions or suits for inducing breach of contract could be brought in federal court; or to use a more proximate analogy, how state threats and intimidation directed at the distributors of certain books could confer standing upon the publisher whose sales are affected. (citation omitted).

*Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir.), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (plaintiff had standing to challenge Department of Justice classification of films as political propaganda, although alleged injury occurred only through irrational public perception of label).

This case is similar to our Circuit's decision in *Intern. U., United Auto., Aero. and Agr. v. Brock*, 783 F.2d 237, 247 (D.C. Cir.1986). There, plaintiff unions challenged a Department of Labor decision which failed to enforce certain reporting requirements mandated under federal law. The court held that plaintiffs had standing to sue, because the government's decision effectively modified an employer's legal reporting obligations—the "fairly traceable" requirement of Article III standing had been easily satisfied. In this proceeding, National Committee is challenging the government's promulgation and implementation of a rule which effectively changed employers' reporting of employee wage reports. Just as this Circuit in *Brock* found that plaintiffs had standing because their injury could be traced to the government's modification of employers reporting obligations, so too plaintiff here has standing as its injury can easily be traced to the government's altering of the reporting procedure.[16]

Although Separation of Powers principles have been deemed relevant in the context of assessing causation, the Supreme Court has never rejected a finding of causation where it was factually appropriate solely due to Separation of Powers considerations. *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 807 (D.C.Cir.1987). Conversely, Separation of Powers principles necessitate judicial action in this case.

Under the APA, 5 U.S.C. § 702, Congress provided a very broad grant of standing to plaintiffs who are "adversely affected or aggrieved by agency action." Our Circuit has regarded this language to be the broadest grant of standing that Congress can confer. *Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1336–37 (D.C.

---

**16.** Moreover, the government's challenge to causation pertains only to injuries resulting from errors in the SSA wage records. Plaintiff's other challenges, however, stemming from the agencies' noncompliance with statutory publication and notice and comment requirements, are clearly traceable to the agencies themselves with no intervening actors.

Cir.1986), *reaffirmed in, Center for Auto Safety v. Thomas,* 847 F.2d 843, 849 (D.C. Cir.1988). Therefore, judicial constriction of this broad congressional mandate to the courts would itself violate Separation of Powers principles:

> Once Congress has extended standing to a broad group of petitioners, concerns for maintaining separation of powers should no longer restrain judicial review. It would make no sense to deny standing under a principle designed to prevent the courts from encroaching on the legislature's domain for when Congress itself has already 'weighed the need for and the value of judicial review of a given category of administrative decisions, and has decided it is warranted.' ... Indeed, far from *preserving* the separation of powers, when Congress has spoken, the courts place themselves in conflict with the legislative branch if they *ignore* the statutory message.

*Center for Auto Safety,* 793 F.2d at 1337 (citation omitted) (emphasis in original).

In addition, courts have a constitutional obligation in effectuating our system of Separation of Powers; they must ensure that executive branch agencies comply with their congressional mandate. *Id.* at 1337; *Brock,* 783 F.2d at 245–46; *Samaritan,* 636 F.Supp. at 518–19. Therefore, our Circuit held that "when an agency does not reasonably accommodate the policies of a statute or reaches a decision that is 'not one, that Congress would have sanctioned,' ... a reviewing court *must intervene* to enforce the policy decisions made by Congress." *Natural Res. Defense Council, Inc. v. Herrington,* 768 F.2d 1355, 1383 (D.C.Cir.1985) (emphasis added) (citations omitted). Congress has already spoken by providing a broad grant of standing to plaintiffs adversely affected or aggrieved by agency action or inaction. If agencies, here the IRS and the SSA, fail to carry out the policies of the statute, then the Court must intervene to enforce Congress' decision.

The government argues that the relief plaintiff seeks would "necessarily enmesh the Court in decisions relating to the allocation of agency personnel and financial resources which are traditionally and properly the sole function of the Executive Branch." Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss, (Aug. 5, 1988) at 45. Yet, many of plaintiff's suggested remedies seek declaratory and injunctive measures narrowly tailored to merely set the parameters for agency decisions rather than to dictate the content of those decisions. Certainly, plaintiff's relief seeking invalidating the statute that authorized the annual wage reporting system involves no judicial entanglement in any discretionary agency decisions.

The Supreme Court's decision in *Allen v. Wright,* 468 U.S. 737, 759, 765, 104 S.Ct. 3315, 3328, 3332, 82 L.Ed.2d 556 (1984), ironically the case on which the government heavily relies, states that standing is available in cases such as this, which challenge "specifically identifiable Government violations of law" or "fundamental [agency] policy." In fact, the caselaw indicates that courts frequently grant standing for broad challenges to agency decisions and procedures. *See, e.g., Center for Auto Safety,* 793 F.2d at 1337 (consumer organization had standing to challenge agency rule pertaining to fuel economy standards); *Herrington,* 768 F.2d 1355 (organization had standing to challenge agency rules regarding energy efficiency standards for various household appliances); *Schweiker v. Gray Panthers,* 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981) (elderly rights organization had standing to challenge HEW regulations for imputing spousal income to Medicaid applicants). Hence, in light of both the trend in caselaw and plaintiff's challenge of specific agency action and inaction, plaintiff has standing to bring this suit.

The government also argues that because congressional and administrative attention has been focused on the reconciliation problem, judicial intervention and action is totally unnecessary. It argues that both before and after the issuance of the GAO Report, the SSA and the IRS have been working at and succeeding in reducing the discrepancies between their records. As an example, it claims that on

July 12, 1988 the IRS and SSA entered into a *new* MOU aimed at significantly improving the reconciliation process and enhancing its efficiency.[17] The government is also conducting "public information efforts" aimed at informing employers of the necessity of filing accurate wage reports and advising employees on how to ensure the accuracy of their individual Social Security accounts.[18]

If the government truly believes that judicial intervention is not needed, it should have sought to dismiss the case on mootness grounds. Although this issue goes to the merits of the case and not to plaintiff's standing, courts in this district have intervened in the past to force or prompt agency action notwithstanding the possibility that congressional efforts may address the problem. *See Samaritan*, 636 F.Supp. at 518–19 (suit to force promulgation of special payment provisions). Moreover, the fact that after *ten years*, Congress has held only two hearings on the reconciliation problem does not counsel against this Court's intervention. In fact, the First Circuit's reasoning in *Caswell v. Califano*, 583 F.2d 9, 16 (1st Cir.1978) equally applies here as it rejected this argument in a suit seeking to remedy administrative delays in scheduling disability benefit hearings:

> It may well be that in certain cases legislative efforts to deal with a problem so clearly manifest Congress' intent that its remedy be exclusive that further judicial relief would be inappropriate. However, such a clear intent to preempt the field is not present here. We cannot construe, as the Secretary urges, congressional concern with the delay problem as an expression of Congress' belief that no problem really exists.... In any event, congressional action to date, far from reflecting a view that the delays complained of here are reasonable, in fact

suggests that Congress believes the problem to be a serious one. And while we agree that Congress must bear the ultimate responsibility for remedying problems in the administration of federal programs, that does not mean that a judicial role is precluded where the statutory mandate is not being followed. The fact, moreover, that the courts seek to remedy the violation of a federal statute in no way precludes Congress from providing additional or different relief, or from clarifying or modifying the statute if the judicial interpretation is not approved. Finally, it is clear that no violence to the principle of the separation of powers arises from judicial efforts to enforce a congressional mandate.

The government also argues that plaintiff fails to satisfy the third *Hunt* requirement for associational standing as individual participation is necessary because plaintiff has demonstrated neither the number nor the percentage of its members who have been adversely affected by the reconciliation problem. The government's argument is not persuasive. Plaintiff's complaint alleges that "many" of its members and supporters have been and will be adversely affected by the challenged government conduct. (Complaint, ¶ 22.) At this stage of the proceedings, however, nothing more is required and these factual allegations must be accepted as true and in plaintiff's favor.[19]

Furthermore, the need for individual participation depends in large part on the type of relief requested. Several courts have held that where plaintiff requests only declaratory and injunctive relief, and not damages, individual participation is generally not needed. *See Humane Society*, 840 F.2d at 53, 55 n. 15; *Brock*, 477 U.S. at 286–87, 106 S.Ct. at 2530–31; *Seldin*, 422 U.S. at 515, 95 S.Ct. at 2213. In the

---

**17.** Defendants' Motion to Dismiss, (Aug. 5, 1988) pp. 17–19.

**18.** In Defendant's Response to Brief Amicus Curiae (January 11, 1989) at 9, the government states that the SSA is currently involved in a campaign publicizing the availability of the Personal Earnings and Benefit Estimate Statement (PEBS).

**19.** In fact, on September 23, 1988, this Court granted plaintiff's motion for a second enlargement of time within which to file a motion for class certification. Plaintiff has to file its motion within 60 days after this Court rules on defendant's motion to dismiss.

present proceeding, plaintiff seeks only declaratory and injunctive relief not damages. Therefore, since "the relief [plaintiff] seek[s] does not take the form of individualized monetary awards, [its] claims do[ ] not require the participation of individual members." *Center for Auto Safety*, 847 F.2d at 848–49 n. 7.

National Committee has alleged three distinct organizational interests, any one of which would entitle it with standing to pursue this litigation. At this stage, its allegations must be accepted as true for purposes of defendants' motion to dismiss. Furthermore, the issue at this stage is not whether plaintiff will prevail on the merits, but rather whether plaintiff has alleged a cognizable injury. *See Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 649 (5th Cir.1983) (claimant's interest in protecting wetlands environment was sufficient to permit suit requiring issuance of environmental impact statement even though actual injury to wetlands was uncertain). Based on the above, National Committee has certainly met this minimum standard.

## CONCLUSION

Jurisdiction and standing are two important and essential elements that must be established in order to bring a suit. National Committee has not only established jurisdiction under Section 1331, as this proceeding is not barred by Section 205(h) of the Act, but also has met the requirements for associational standing. Plaintiff has also established mandamus jurisdiction as an additional jurisdictional basis, to compel the Secretary to perform its necessary duty to the plaintiff.

The government's motion to dismiss for lack of subject matter and mandamus jurisdiction as well as standing therefore must be DENIED.