Brenda ROBERTS, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.

No. 1:03CV1920(PLF).

United States District Court, District of Columbia.

March 29, 2005.

Stephen M. Kohn, Kohn, Kohn & Colapinto, P.C., Washington, DC, for Plaintiffs.

Alan Burch, U.S. Attorney's Office, Washington, DC, for Defendants.

## ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO DISMISS

STAFFORD, Senior District Judge, sitting by designation.

Plaintiffs, John and Brenda Roberts and Jane Turner, are three current or former employees of the Federal Bureau of Investigation ("FBI"). They have sued the defendants, alleging that the defendants improperly processed their whistleblower reprisal complaints, improperly disclosed Privacy Act information about them, retaliated against them for exercising their First Amendment rights, and failed to produce documents pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

Before the court at this time is the defendants' partial motion to dismiss and motion for partial summary judgment. Doc. 12. The plaintiffs have responded (doc. 24) in opposition to the motion, and the defendants have filed a reply (doc. 26). The parties were advised that the defendants' motion would be taken under advisement by a date certain.

I.

A.

Briefly, the facts as alleged in the plaintiffs' amended complaint are as follows:

Brenda Roberts ("Mrs.Roberts") is employed as a secretary and administrative assistant at FBI headquarters in Washington, D.C., where her husband, John Roberts ("Agent Roberts") is employed as a Special Agent and a Unit Chief within the FBI's Office of Professional Responsibility. Jane Turner ("Agent Turner") is employed as an FBI Special Agent in Minnesota.

In or about May, 1995, Agent Roberts was named Inspector–in–Charge of events at Ruby Ridge. During the course of this assignment, Agent Roberts's actions led to the successful prosecution of a then-active Special Agent in Charge of the FBI, the removal of the Deputy Director of the FBI, and administrative findings of misconduct and malfeasance by FBI officials.

In or about October, 1997, Agent Roberts was assigned the sole responsibility for investigating the alleged misconduct by nine high-ranking officials of the FBI, including an Assistant Director, a section chief, and seven Special Agents in Charge. The misconduct concerned voucher fraud and false statements and was commonly known as the "Potts Party" investigation. Agent Roberts's investigation confirmed the misconduct by the six officials who did not retire prior to the release of the administrative findings.

Like the Ruby Ridge investigation, the high profile Potts Party investigation resulted in national media attention. Agent Roberts's performance for his work on both investigations was rated at the highest possible rating and has never been criticized.

In April of 2001, Agent Roberts sent a complaint to the Attorney General, alleging that the FBI discriminated against him in retaliation for his involvement in the Ruby Ridge and Potts Party investigations. He claimed that, as a result of his work on the two investigations, he was denied numerous promotional opportunities and was subjected to harassment. According to Agent Roberts, DOJ failed to complete any investigation concerning Mr. Roberts's claim in the time period mandated under the controlling regulations.

On or about July 18, 2001, Agent Roberts testified as a witness before the Senate Judiciary Committee. In testimony that was widely reported in the national news media, Agent Roberts (1) described a "double standard" of discipline under which senior FBI officials received lenient treatment, (2) provided specific testimony concerning FBI misconduct at Ruby Ridge, (3) testified about senior FBI officials engaging in voucher fraud in order to attend a party at taxpayer expense, and (4) suggested that there was retaliatory animus within the FBI concerning whistleblowers.

In October, 2002, with the written consent of the FBI, Agent Roberts was interviewed on air by the news show *60 Minutes*. On that show, Agent Roberts spoke critically about the FBI, particularly about its alleged double standard in the administration of discipline. According to Agent Roberts, following the *60 Minutes* show, the Deputy Director of the FBI circulated an e-mail that was highly derogatory to Agent Roberts and that accused him of "tarnishing the badge" of the FBI.

On November 13, 2003, DOJ's Office of Inspector General ("OIG") issued a report entitled "A Review of Allegations of a Continuing Double Standard of Discipline at the FBI." OIG provided a copy of this report to the FBI, whose director thereafter issued a statement that allegedly contained false and misleading information concerning the OIG report. According to Agent Roberts, the Director's statement was intended to decredit Agent Roberts. Although Agent Roberts, through counsel, asked the Attorney General to take action under the Privacy Act to correct the Director's false and misleading statement, no action was taken.

On or about November 11, 2002, Mrs. Roberts sent a complaint to the Attorney General. Among other things, Mrs. Roberts complained that, based on her husband's activities, the FBI had subjected her to a hostile work environment result-

ing in two severe physical reactions requiring her to seek medical attention.

On August 12, 2003, Mrs. Roberts filed a complaint with OIG. Mrs. Roberts stated that her life was directly threatened by her severe adverse physical reactions to the hostile environment. OIG responded to Mrs. Roberts's complaint by a draft report dated August 29, 2003, and—without the consent of Mrs. Roberts—provided the FBI with a copy of its findings. In its draft report, OIG concluded that an atmosphere existed in Mrs. Roberts's work environment that was difficult, if not untenable. As a result, OIG recommended that Mrs. Roberts be given a choice of an alternative position. By letter dated September 12, 2003, the FBI offered to find Mrs. Roberts a comparable position. By that same letter, the FBI informed Mrs. Roberts that it was denying her request for continued paid leave and that if she did not report back to work on or after September 23, 2003, she would be declared AWOL and subjected to disciplinary action.

On or about February 24, 2001, Agent Turner initiated a whistleblower proceeding with DOJ. DOJ delegated the matter to its Office of Professional Responsibility ("OPR"). When a year passed without any apparent investigation having occurred, Agent Turner's counsel informed OPR by letter that Agent Turner wanted to withdraw her complaint without prejudice. OPR never responded to that letter. On October 9, 2002, Agent Turner refiled her whistleblower claims with OPR. Although OPR never advised Agent Turner about the status of this second complaint, on or about June 13, 2003, without notice to Agent Turner, OPR informed two FBI officials by letter that Agent Turner's reprisal allegations were without merit. OPR allegedly refused to reopen Agent Turner's whistleblower proceedings based on her October 9, 2002, filing, but instead published a report concerning Agent Turner's first complaint to the FBI and others—all without notice and/or input from Agent Turner.

### B.

The plaintiffs include nine counts in their forty-eight (48) page amended complaint that is anything but a model of clarity. In Counts I, III, and V, Mrs. Roberts, Agent Turner, and Agent Roberts, respectively, seek injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, for the defendants' alleged failure to properly process their respective whistleblower reprisal complaints in compliance with the procedures required by the Civil Service Reform Act ("CSRA"). In Counts II, IV, and VII, Mrs. Roberts, Agent Turner, and Agent Roberts, respectively, allege that their right to privacy under the Privacy Act of 1974, 5 U.S.C. § 552a, was violated when information regarding their whistleblower complaints was disclosed to the FBI and others. In Counts VI and VII, the Roberts allege that their rights under the First Amendment were violated when the FBI retaliated against them after Agent Roberts engaged in protected speech. In Counts VIII and IX, Agent Roberts alleges that the FBI violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), by denying his requests for public records.

### II.

The plaintiffs contend that this court has subject matter jurisdiction over Counts I, III, and V under the APA. To be sure, the APA authorizes federal courts to grant declaratory and/or injunctive relief against the United States. Specifically, 5 U.S.C. § 702 states that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee there-

of acted or failed to act in an official capacity ... shall not be dismissed ... on the ground that it is against the United States." Although the Supreme Court long ago held that the APA does not itself serve as an implied grant of federal court jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Court has since made clear that jurisdiction over APA challenges to federal agency action is vested in district courts *unless* a preclusion of review statute specifically bars judicial review in the district court. *See, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

■ Citing *Carducci v. Regan*, 714 F.2d 171 (D.C.Cir.1983), the defendants maintain that the APA provides no basis for this court to assert subject matter jurisdiction over the plaintiffs' nonconstitutional claims alleged in Counts I, III, and V because the Civil Service Reform Act ("CSRA") bars judicial review of claims within the purview of the CSRA. *See Carducci*, 714 F.2d at 175 (holding that the CSRA's exclusive and comprehensive remedial scheme precludes review under the APA of disputes that concern not only employment practices specifically prohibited under the CSRA but also employment practices that are "*so* insignificant as not even to bear mention in the [CSRA]"). A careful review of the CSRA convinces this court that the defendants are correct.

### A.

Congress enacted the CSRA to provide procedures for civil service employees to challenge personnel actions. Concerned about the costs and benefits of federal personnel-related litigation, Congress carefully designed the remedial provisions of the CSRA to provide employees with differing amounts of process depending upon the classification of the employee [1] and the seriousness of the personnel action taken. Generally speaking, for serious agency actions ("adverse actions") in response to employee misconduct, the CSRA provides the right to appeal directly to the Merit Systems Protection Board ("MSPB"), with judicial review of the MSPB decision in the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1). For less serious *specified* agency actions ("prohibited personnel practices"), *see* 5 U.S.C. § 2302(b), the CSRA requires an employee to first pursue his or her claim with the Office of Special Counsel ("OSC"), and then, if necessary, with the MSPB. Judicial review of a prohibited personnel practice may be sought only after an employee obtains a final decision from the MSPB.

In *Carducci*, the plaintiff ("Carducci") experienced a reassignment based on poor performance. When his request for review was rejected by the OSC based on insufficient evidence of a "prohibited personnel practice," Carducci sought equitable relief (including reinstatement) in federal court under the APA. Carducci argued that direct judicial relief was not precluded because the challenged agency actions did not amount to specified prohibited person-

---

1. The CSRA divides civil service employees into three main classifications that can be generally described as follows: "Senior Executive Service" employees are those who occupy high-level positions in the Executive Department, but for whom appointment by the President and confirmation by the Senate is not required. 5 U.S.C. § 3132(a)(2). "Competitive service" employees are all other employees for whom nomination by the President and confirmation by the Senate is not required, and who are not specifically excepted from the competitive service by statute or by statutorily authorized regulation. § 2102. "Excepted service" personnel are the remainder—those who are in neither the competitive service nor the Senior Executive Service. § 2103.

nel practices and did not, therefore, fall within the remedial scheme of the CSRA. The district court dismissed his case for failure to state a claim, and the circuit court affirmed. In affirming, the circuit court explained that "failure to include some types of nonmajor personnel action within the remedial scheme of so comprehensive a piece of legislation reflects a congressional intent that no judicial relief be available—that the matter be deemed 'committed to agency discretion by law,' *see* 5 U.S.C. § 701(a)(2)." *Carducci,* 714 F.2d at 174 (footnote omitted). Because Carducci sought direct judicial review of actions that were either required to be initially considered by the OSC or where otherwise "committed to agency discretion by law," the circuit court held that Carducci failed to set forth any valid claim under the APA.

### B.

As employees of the FBI, the plaintiffs serve in an "excepted service." 28 U.S.C. § 536. Although most excepted service employees are eligible to invoke the above-described procedures relating to prohibited personnel practices, the CSRA expressly provides that FBI excepted service employees do not have this right. 5 U.S.C. § 2302(a)(2)(C)(ii).

The rights of FBI employees are addressed in section 2303(a), which provides a limited and specific protection to FBI agents who are subject to employment-based reprisals for whistleblowing. Section 2303(a) provides as follows:

(a) Any employee of the Federal Bureau of Investigation who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority, take or fail to take a personnel action with

respect to any employee of the Bureau as a reprisal for a disclosure of information by the employee to the Attorney General (or an employee designated by the Attorney General for such purpose) which the employee or applicant reasonably believes evidences-

(1) a violation of any law, rule or regulation, or

(2) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

5 U.S.C. § 2303(a).[2] Section 2303(b) provides that "[t]he Attorney General shall prescribe regulations to ensure that such a personnel action shall not be taken against an employee of the Bureau as a reprisal for any disclosure of information described in subsection (a) of this section." Section 2303(c) provides that "[t]he President shall provide for the enforcement of this section in a manner consistent with applicable provisions of sections 1214 and 1221 of this title."

On April 14, 1997, President Clinton delegated to the Attorney General his "functions concerning employees of the Federal Bureau of Investigation vested in [him] by . . . section 2303(c) of title 5, United States Code," and directed the Attorney General to establish "appropriate processes within the Department of Justice to carry out these functions." 62 Fed. Reg. 23123 (Apr. 14, 1997). Pursuant to this authority, the Department of Justice ("DOJ") adopted a final rule (the "Rule"), effective November 1, 1999, establishing procedures under which FBI employees may make disclosures of information protected by the CSRA. The Rule also established procedures under which the DOJ will investigate allegations by FBI em-

---

**2.** The Attorney General has designated the DOJ OPR, DOJ OIG, and FBI OPR as the specific offices to which an FBI employee may make protected disclosures.

ployees of reprisal for making such protected disclosures and under which it will take appropriate corrective action.

Under the Rule, codified at 28 C.F.R. § 27, an FBI employee who believes that he or she has been the subject of a reprisal for making protected disclosures may report the alleged reprisal to OPR or OIG (collectively, the "Investigative Offices"). 28 C.F.R § 27.3(a)(1). Jointly, the Investigative Offices must determine which office (the "Conducting Office") is more suited to conduct an investigation into the allegation. The Conducting Office must investigate any allegation of reprisal "to the extent necessary to determine whether there are reasonable grounds to believe that a reprisal has been or will be taken." *Id.* at § 27.3(d). If the Conducting Office determines that reasonable grounds do not exist, it must report such determination to the complainant, who then has an opportunity to respond. *Id.* at § 27.3(g)-(h). If the Conducting Office determines that reasonable grounds do exist, it must report such conclusion to the Director of the Office of Attorney Recruitment and Management (the "Director"), together with any findings and recommendations for corrective action. *Id.* at § 27.4(a). The Director must then "determine, based on all the evidence, whether a protected disclosure was a contributing factor in a personnel action taken or to be taken." *Id.* at § 27.4(e)(1). If the Director determines that a protected disclosure "was a contributing factor in a personnel action taken or to be taken, the Director shall order corrective action as the Director deems appropriate." *Id.* at § 27.4(e)(1). If the Director finds no reprisal, he or she must report that finding in writing to the complainant, the FBI, and the Conducting Office. *Id.* at § 27.4(g).

Under the Rule, a complainant may appeal an Investigating Office's denial of corrective action to the Director, *id.* at § 27.4(c)(1), and may seek review of the Director's decision by the Deputy Attorney General. *Id.* at § 27.5. The Rule, however, does not permit a complainant to seek judicial review or otherwise pursue a reprisal case through entities external to and independent of the DOJ. *See* 64 Fed.Reg. 58782, 58785 (Nov. 1, 1999) (explaining that "[i]f Congress had wanted to provide FBI employees with fora outside the Department to address their whistleblower reprisal claims, it could have included them in the OSC/MSPB scheme," and "[t]he fact that Congress did not do so...strongly suggests that Congress, in enacting section 2303, did not envision the creation of external entities to perform the OSC/MSPB functions."); *see also id.* at 58786 ("Section 2303 (the source of authority for the rule) does not provide for judicial review, and Congress has therefore not waived sovereign immunity for this purpose."); *id.* at 58783 ("We gave (the FBI) special authority...to let the President set up their own whistle-blower system so that appeals would not be to the outside but to the Attorney General.") (quoting 124 Cong. Rec. 28770 (1978)).

### C.

The plaintiffs try to avoid the exclusivity of the CSRA by arguing that they are not seeking judicial review of their reprisal cases but are, instead, seeking to enjoin the defendants from continuing to violate their rights under the Rule implementing their right to reprisal protection. Specifically, Mrs. Roberts and Agent Turner seek to enjoin the defendants from violating their alleged right to privacy under the Rule,[3] and Agent Roberts seeks an order

---

3. Although Mrs. Roberts and Agent Turner now suggest that they are not seeking adjudi-

enjoining the defendants from denying him paid leave "until such time as the OIG conducts a full and complete investigation of [his] complaints in accordance with law."[4] Am. Compl. at ¶ 141. The court is unpersuaded, however, that the plaintiffs' allegations—even as now explained and/or limited—state a claim for relief under the APA.[5]

As a general rule, the CSRA prohibits specified minor personnel actions whose motivation is the violation of "any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301." 5 U.S.C. § 2302(b)(11). For most federal employees, section 2302(b)(11) would give the OSC jurisdiction over complaints concerning specified personnel actions taken in violation of the rules and/or regulations promulgated under the CSRA. As members of the excepted service, however, FBI employees may not employ the remedial scheme available to most other federal employees. That Congress deliberately excluded FBI employees from the provisions establishing administrative and judicial review for personnel actions involving violations of CSRA implementing regulations suggests that Congress meant to *preclude* judicial review for such actions. *See United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (holding that the CSRA, in failing to provide

explicitly for administrative or judicial remedies for certain decisions affecting nonpreference excepted service employees, implicitly bars judicial remedies under 5 U.S.C. § 5596 ("Back Pay Act")); *see also Borrell v. United States Int'l Communications Agency,* 682 F.2d 981, 988 (D.C.Cir.1982) (concluding that "Congress did not mean to allow the district courts any extensive supervisory jurisdiction over the way in which the CSRA's mandates are enforced"). Because it is evident that Congress intended to shield the FBI's employment-related decisions from judicial review, including those decisions involving violations of "any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301," FBI employees may not challenge such decisions in federal court under the APA. *Carducci,* 714 F.2d at 174–175 (finding that a federal employee may not pursue an APA claim in federal court where the CSRA provides no basis for judicial review).

The plaintiffs here are asking this court to do what Congress and many courts have said it cannot do: fashion a judicial remedy outside the ambit of a statute—the CSRA—that was and is intended to be the exclusive remedy for federal employees alleged to have been aggrieved by actions related to their employment. The court

---

cation/review of their reprisal complaints, their amended complaint does not make that limitation evident. For example, Mrs. Roberts asks that the defendants "be enjoined from taking any further adverse or prohibited personnel action against [her]." Am. Compl. at ¶ 54. Agent Turner asks that the DOJ "be ordered to cease and desist the publication of the DOJ OPR draft report [finding no reprisal]...and be ordered to conduct a full, fair and impartial investigation of [her whistleblower claims]." Am. Compl. at ¶ 98.

4. Agent Roberts also seeks to enjoin the defendants "from taking any further adverse or

prohibited personnel action against Mr. Roberts, including continued discrimination against his wife, and continued failure to correct the numerous retaliatory failures to promote Mr. Roberts." Am. Compl. at ¶ 140.

5. It is anything but clear, moreover, whether the plaintiffs have standing to seek injunctive relief because their allegations do not suggest a "real and immediate" threat that they will again be subject to the improper disclosure of a whistleblower complaint or to an untimely-completed whistleblower investigation.

thus finds that the plaintiffs' allegations of CSRA violations do not fall within this court's subject matter jurisdiction.[6]

### III.

■ In Count VI and Count VII (in part), the Roberts allege that the FBI retaliated against them in violation of the First Amendment for statements that Mr. Roberts made before the Senate Judiciary Committee and on the news show, *60 Minutes*. They seek an order requiring "the FBI to reinstate Mr. and Mrs. Roberts into the FBI into positions for which they would have been entitled had the FBI not violated the First Amendment." Am. Compl. at p. 45. The defendants maintain that such claims should be dismissed because the Roberts failed to first exhaust their administrative remedies. The Roberts contend that such exhaustion is unnecessary.

■ This circuit has long held that "when a constitutional claim is intertwined with a statutory one, and Congress has provided machinery for the resolution of the latter, a plaintiff must first pursue the administrative machinery." *Steadman v. Governor, U.S. Soldiers' and Airmen's Home*, 918 F.2d 963 (D.C.Cir.1990). In the context of a CSRA case, exhaustion is required when the statutory and constitutional claims are "premised on the same facts" and the CSRA remedy "would have been fully effective in remedying the constitutional violation." *Id.* at 967 (quoting *Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C.Cir.1984)). A plaintiff, moreover, cannot escape the exhaustion requirement by seeking injunctive, rather than mone-

tary, relief. *See Nat'l Treasury Employees Union v. King*, 961 F.2d 240, 243 (D.C.Cir.1992) (exhaustion requirement not excused simply because the plaintiff sought injunctive relief).

The defendants contend that the Roberts's statutory and constitutional claims are "premised on the same facts" and that CSRA remedies would be "fully effective in remedying the constitutional violation." *Steadman*, 918 F.2d at 967. Certainly, the Roberts's claims are premised, at least in part, on the same facts. It is less clear, however, whether CSRA remedies would be "fully effective" in remedying the alleged First Amendment violation. As noted in *Weaver v. United States Information Agency*, 87 F.3d 1429, 1432 (D.C.Cir.), cert. denied, 520 U.S. 1251, 117 S.Ct. 2407, 138 L.Ed.2d 174 (1997), "prohibited personnel practices" include "tak[ing] or fail[ing] to take any...personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 [of Title 5]." 5 U.S.C. § 2302(a)(1) & (b)(11). Among the merit system principles in section 2301 is the requirement that all employees be treated "with proper regard for their privacy and constitutional rights." *Id.* at § 2301(b)(2). Thus, for most federal employees, it is a "prohibited personnel practice" to take a personnel action that unconstitutionally burdens an employee's speech; and the CSRA provides remedies for such practices.

The Roberts, however, are members of the excepted service. Indeed, as FBI employees,[7] it appears that they are entitled

---

6. To the extent Agent Roberts alleges that he failed to receive a full and complete investigation of his section 2303 complaints, the court notes that he fails to allege that he ever submitted his complaint to the proper authority (DOJ OPR or DOJ OIG) or that he com-

plained about a reprisal for statements made to the Attorney General or his designees.

7. Under section 2303(a)(2)(C)(ii), the FBI is also excluded from the definition of "agency" for purposes of section 2302.

to seek CSRA remedies for only one "prohibited personnel practice:" namely, for "a reprisal for a disclosure of information by the employee to the Attorney General (or an employee designated by the Attorney General for such purpose) which the employee...reasonably believes evidences...a violation of any law...or...mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2303(a). The defendants, whose burden it is to plead and prove exhaustion, have not explained—nor have they cited any authority to suggest—how section 2303 serves to protect the Roberts from reprisals for information disclosed to persons/entities other than those specified in the statute.[8] The defendants have thus failed to establish that they are entitled to dismissal of Counts VI and VII on the basis of exhaustion.

■ The defendants also maintain that the First Amendment claim in Count VII should be dismissed for failure to state a claim. In Count VII, Agent Roberts alleges that he exercised his First Amendment rights when he appeared on *60 Minutes* and stated that the FBI was plagued by an improper double standard in the administration of discipline. He goes on to allege that after OIG investigated these allegations and shared its report with the FBI, the FBI Director issued a statement that contained false and misleading information about the OIG report. Although Agent Roberts does not allege that the FBI Director's statement even mentioned his name, he alleges that the statement was intended to "interfere with Mr. Roberts' career as an FBI agent, humiliate Mr.

Roberts among his fellow FBI employees and force Mr. Roberts to retire from the FBI," all in violation of the First Amendment. Am. Compl. at ¶ 174. He does not allege in Count VII that any tangible adverse action was taken against him as a result of the FBI Director's statement.

■ As correctly noted by the defendants, a government official's criticism, without more, does not give rise to a constitutional deprivation for First Amendment purposes. *Block v. Meese*, 793 F.2d 1303, 1313 (D.C.Cir.1986) (stating that "[w]e know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content"); *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir.1997) (explaining that "mere criticisms do not give rise to a constitutional deprivation for purposes of the First Amendment"). Instead, to state a First Amendment retaliation claim, an employee must allege an adverse employment action that rises to the level of a constitutional deprivation. While the adverse employment action need not amount to a demotion or a reduction in pay, some tangible adverse action is required. *Tao v. Freeh*, 27 F.3d 635, 639 (D.C.Cir.1994). In Count VII, Agent Roberts has alleged no such action. The defendants are accordingly entitled to dismissal of Count VII, to the extent, if any, it alleges a First Amendment claim.

## IV.

In Counts II, IV, and VII, Mrs. Roberts, Agent Turner, and Agent Roberts, respectively, allege that the defendants violated

---

8. In section 2302, which does not apply to the FBI, Congress provided that "[t]his subsection [describing 'prohibited personnel practices'] shall not be construed to authorize the withholding of information from the Congress or the taking of any personnel action against an employee who discloses information to the Congress." Notably, section 2303, which is applicable to FBI employees, does not contain this language.

their rights under the Privacy Act of 1974 ("Privacy Act"), 5 U.S.C. § 552a. Among other things, they seek "$1000.00 per Privacy Act violation in statutory damages." Am. Compl. at p. 46.

The Privacy Act provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). The Act makes an exception for disclosure "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The Act defines a record as "any item, collection, or grouping of information about an individual that is maintained by an agency, including but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." 5 U.S.C. § 552a(a)(4). The Act defines a system of records as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5).

An individual may file a civil action against an agency that fails to comply with the Act's provisions "in such a way as to have an adverse effect on [the] individual." 5 U.S.C. § 552a(g)(1)(D). In order to receive damages, the plaintiff must prove that the government's actions were intentional or willful. *Id.* at § 552a(g)(4).

## A.

In Count II, Mrs. Roberts alleges that her rights under the Privacy Act were violated when OIG provided the FBI—without her consent—a copy of its August 29, 2003, draft report regarding her retaliation/reprisal complaints. She has attached to her response in opposition to the defendants' motion to dismiss a portion of OIG's final report, and she has suggested—with no objection from the defendants—that such attachment may be considered by the court without converting the motion to dismiss to one for summary judgment. The court will accordingly consider the information in the attachment as additional allegations of fact made by Mrs. Roberts.

The defendants contend that Mrs. Roberts's Privacy Act claim is subject to dismissal because her allegations, especially as supplemented by her attachment of a portion of OIG's final report, establish that OIG's disclosure of its draft report was a permissible intra-agency "need-to-know" disclosure. The court agrees.

As set forth in her attachment, on July 1 and 2, 2003, counsel for Mrs. Roberts and Mrs. Roberts herself, respectively, made written complaints to FBI Director Robert Mueller ("FBI Director") alleging that she suffered retaliation for her husband's appearance on *60 Minutes.* The FBI Director forwarded her complaints to OIG for investigation and asked that OIG forward its analysis and recommendations to the FBI expeditiously. OIG was in the process of preparing its report to the FBI Director when, on August 12, 2003, Mrs. Roberts filed a whistleblower complaint with OIG. Because the matters raised in Mrs. Roberts's August 12 whistleblower complaint were "substantially identical" to those matters raised in the two letters sent to the FBI on July 1 and 2, OIG did not open a new investigation but instead of-

fered Roberts an opportunity to comment on the draft report that OIG was providing to the FBI in response to the FBI's referral to OIG. Doc. 24, Ex. 1 at 2 n. 3. Subsequently, Mrs. Roberts's counsel submitted comments on the draft report by letter to OIG and to the FBI.

Allegations that OIG provided the FBI with a copy of OIG's draft report, which was prepared at the behest of the FBI in response to complaints made to the FBI by Mrs. Roberts herself, fall far short of stating a claim under the Privacy Act. Mrs. Roberts sought corrective action from the FBI when she sent letters of complaint to the FBI Director on July 1 and 2, 2003. The FBI undertook to investigate Mrs. Roberts's complaints in an entirely appropriate manner when it referred the matter to OIG. OIG had the authority to investigate the matter, whether or not Mrs. Roberts herself filed a reprisal complaint.[9] For Mrs. Roberts to now suggest that the Privacy Act should be construed so as to prevent OIG from sharing the results of its investigation with the FBI is disingenuous. Indeed, the court finds that the Privacy Act not only did not prohibit but it expressly permitted OIG to transfer its draft report to intra-agency FBI employees who had a need for the report in the performance of its duties, including its duty to take appropriate action in response to Mrs. Roberts's complaints. The defendants' motion to dismiss Mrs. Roberts's Privacy Act claim is well-taken and will be granted.

## B.

■ Agent Roberts alleges in Count VII that the defendants violated the Privacy Act when the FBI Director issued a "false and misleading" statement regarding the allegations of FBI wrongdoing that Agent Roberts publicly made on *60 Minutes.* Specifically, Agent Roberts alleges that, after he made allegations regarding an improper double standard on *60 Minutes,* OIG commenced an investigation into the validity of Agent Roberts's allegations. On November 13, 2003, OIG released a report entitled: "A Review of Allegations of a Continuing Double Standard of Discipline at the FBI." Am. Compl. at ¶ 168. The FBI Director responded to the release of OIG's report by issuing a statement that allegedly contained false and misleading information about the OIG report. For example, the FBI Director allegedly made the following "inaccurate" statement: "After reviewing the report, I am gratified that accusations of a double standard were not substantiated." Am. Compl. at ¶ 173. Agent Roberts alleges that the accusations of a double standard identified by the Director "were based on confidential information provided to the DOJ OIG by Mr. Roberts, and were widely known within the FBI and various members of the public to be directly related to the accuracy and integrity of Mr. Robert's [sic] whistleblowing." Am. Compl. at ¶ 176.

The defendants maintain—and the court agrees—that these allegations are insufficient to state a claim under the Privacy Act because Agent Roberts fails to allege any facts to establish that the FBI Director's statement constituted a "record...about" Agent Roberts or that the FBI Director used information taken from a "record...about" Mr. Roberts when he issued his statement. Instead, Agent Roberts alleges that the FBI Director responded to an OIG report that was re-

---

9. The Regulations provide that "[n]othing in this part shall prohibit the Receiving Offices, in the absence of a reprisal allegation by an FBI employee under this part, from conducting an investigation, under their pre-existing jurisdiction, to determine whether a reprisal has been or will be taken". 28 C.F.R. § 27.3(j).

leased to the public and that examined the validity of public allegations of misconduct lodged against his agency.

That Agent Roberts includes in his allegations boilerplate language taken from the Privacy Act itself does not change the result. For example, Agent Roberts alleges that the defendants violated specific provisions of the Privacy Act by (1) disclosing "the contents of records maintained in Privacy Act systems of records," Am. Compl. at ¶ 184; (2) failing "to promptly amend or correct records pertaining to plaintiff John Roberts;" *id.* at ¶ 183; (3) failing to make "any effort to assure the accuracy, completeness, timeliness or relevance of the aforementioned statement by the Director;" *id.* at ¶ 185; (4) "maintaining records describing how plaintiff exercises rights guaranteed by the First Amendment." *id.* at ¶ 186; and (5) failing to establish rules of conduct for persons involved in the design, development, operation or maintenance of any system of records. *Id.* at ¶ 187. Without factual allegations regarding a " 'record . . . about" Agent Roberts, the boilerplate allegations regarding violations of the Privacy Act are not sufficient to state a claim for relief.

## C.

In Count IV, Agent Turner alleges that OPR violated the Privacy Act in two ways: (1) by disclosing "to the FBI and non-FBI individuals," without her consent, a draft report containing OPR's findings regarding Agent Turner's reprisal claims; Am. Compl. at ¶ 106; and (2) by sending letters to at least two current or former FBI officials—Douglas J. Domin ("Domin"), a retired FBI manager, and James Burrus ("Burrus"), Acting Assistant Director of FBI OPR—stating that Agent Turner's reprisal allegations were "not meritorious." Am. Compl. at ¶ 86.

The defendants contend that they are entitled to summary judgment as to the first of these claims because the evidence shows that OPR never disclosed its draft report to the FBI or to anyone else. Indeed, the defendants have filed the declarations of two OPR officials, each of whom declares that Robert B. Lyon, Jr. ("Lyon"), then an associate counsel in OPR, investigated Turner's allegations of reprisal and completed a closing memorandum to the investigative file on May 20, 2003, shortly before he retired. Lyon's memorandum bears no notations indicating that copies were to be provided to the FBI or anyone else. Pursuant to normal OPR procedure, Lyon's memorandum was reviewed and approved by OPR's Deputy Counsel on June 4, 2003, then placed in the investigative file. According to both OPR officials:

> The practice of OPR is to accompany any transmittal of a closing memorandum or report to a person or entity outside the office with a transmittal memorandum or letter. Copies of such transmittal documents are maintained in both the investigation file and in the office's chronological correspondence file. I have inspected the entire investigative file and the chronological file of OPR correspondence covering May 15, 2003 to September 15, 2003, and found no transmittal documents forwarding the closing memorandum to the file regarding the inquiry into SA Turner's allegations to anyone outside OPR.

Doc. 12, Decls. of Hoopes and Hendricks at ¶ 6. Both officials admit that a draft copy of the closing memorandum was provided, intra-office, to Paul Yanowitch in the DOJ OIG.

In response to the defendants' evidence, Agent Turner has filed a copy of a letter dated June 13, 2003, sent by OPR to Do-

min (retired FBI manager), which states, in its entirety:

> We have concluded our inquiry into SA Jane Turner's February 2001 reprisal allegations against you and other former managers in the FBI's Minneapolis Division. By letter dated March 1, 2002, SA Turner, through counsel, withdrew her whistleblower claim to this Office. Despite her withdrawal of the complaint, we had already determined, based on our review of the substantial record available to us, including your written submission of August 1, 2002, that her claim was not meritorious.

Doc. 24, Ex. 2. Agent Turner suggests that this letter is sufficient to establish a genuine issue of material fact as to what information was shared or disclosed by OPR to others about the OPR investigation. The letter, however, is not inconsistent with the defendants' evidence that OPR's closing memorandum was never disclosed to the FBI or to anyone else. The letter simply reveals that OPR informed an FBI manager, who was himself one of the subjects of Agent Turner's reprisal accusations, that Agent Turner's claim was found to be "not meritorious." OPR was authorized—indeed required—to share such information pursuant to 28 C.F.R. § 27.4(g), which states that if OPR "determines that there has not been a reprisal, [OPR] shall report this finding in writing to the complainant, the FBI, and the Conducting Office."

While Agent Turner has submitted no evidence to cast doubt on the defendants' evidence regarding the nondisclosure of OIG's draft report or closing memorandum to the FBI, the court is mindful that Agent Turner has not had an opportunity to conduct discovery. She suggests, moreover, that it is not at all clear what the absence of a transmittal letter in the investigative file means, given that OPR sent at least one letter—the one to Domin—without any evidence of its transmittal being placed in the file. Agent Turner argues that she should be permitted to conduct discovery as to who obtained access to the OPR report before the defendants' motion for summary judgment is entertained.

 Assuming, just for the sake of argument, that Agent Turner's Privacy Act claim is not ripe for summary judgment, the defendants are nonetheless entitled to dismissal of her claim that OPR's disclosure of its draft report to the FBI violated the Privacy Act. Agent Turner has alleged that she formally leveled accusations of reprisal against the FBI, thus setting into motion an investigation regarding her accusations. Presumably, the FBI, as a respondent, was involved in that investigation. To the extent Agent Turner alleges that OPR disclosed its closing memorandum to the very agency that was the subject of the investigation, she has failed to state a claim under the Privacy Act.

The defendants contend—and again the court agrees—that Agent Turner's allegations about the letters sent to two current or former FBI officials (Domin and Burrus),[10] informing them that Agent Turner's reprisal claims were not meritorious, are also insufficient to state a claim under the Privacy Act. The need for disclosing investigation reports to the investigated entity or persons is obvious. Because OPR was entitled to share information regarding the *results* of its investigation with the very persons who were the *subject* of its investigation, the defendants are entitled to dismissal of this claim for failure to state a claim.

---

**10.** Agent Turner has alleged that the letter sent to James Burrus was similar to the letter sent to Douglas J. Domin, suggesting that Burris, like Domin, was an FBI manager against whom Agent Turner leveled her reprisal accusations.

## V.

In Counts VIII and IX, Agent Roberts alleges that the FBI and OIG violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), by denying him access to records that he requested. The defendants seek dismissal of two of Agent Roberts's four FOIA claims: namely, the one and only request he made to OIG, No. 03–OIG–77, and one of the requests—No. 965544—that he made to the FBI. The defendants contend, and have submitted evidence to demonstrate, that Agent Roberts failed to exhaust his administrative remedies with regard to these two claims. In response, Agent Roberts states that the defendants' motion to dismiss the two claims should be denied as moot based on the Stipulation and Consent Order (doc. 18) entered in this case regarding his other two FOIA claims. He has presented no evidence to contradict the defendants' evidence; he has not argued that he did, in fact, properly exhaust his remedies regarding these claims; and he has not explained why the Stipulation and Consent Order, which makes no mention of the two requests at issue here, should serve to moot the defendants' motion to dismiss.

The defendants having demonstrated that Agent Roberts failed to exhaust his administrative remedies regarding Request Nos. 03–OIG–77 and 965544, any claims for judicial relief regarding these two requests must be dismissed for lack of subject matter jurisdiction.

## VI.

For the reasons set out above, it is ORDERED:

1. The defendants' partial motion to dismiss (doc. 12) is GRANTED as to Counts I, II, III, IV, V, VII, VIII, and IX and DENIED as to Count VI.

2. Counts I, III, and V are DISMISSED in their entirety for lack of subject matter jurisdiction.

3. Counts II, IV, and VII are DISMISSED in their entirety for failure to state a claim.

4. Counts VIII and IX are DISMISSED as to FOIA request Nos. 03–OIG–77 and 965544 for failure to exhaust administrative remedies.